JUDGE OETKEN

24 CV 08459

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

U.S. District Court # 3:24-cv-01546

U.S. DISTRICT COURT FILED NOV - 6 2024 S.D. OF N.Y.

U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE : FST Cv 13 6020232 S
FOR THE LXS 2006-12N :
V. :
O'HARA, FRANCIS, et al :
EDWARD O'HARA.

NOV 6, 2024 EJO.

**NOTICE OF REMOVAL TO THE U.S. BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

The defendant Edward O'Hara hereby removes this case from the U.S District Court of under 28 U.S.C. Ss 1446 (a) and under Bankruptcy Rule 9027 A, to the United States Bankruptcy Court of the Southern District of NY.

This is a core proceeding. The defendant consents to the entry of final orders by the bankruptcy judge.

The U.S. Bankruptcy Court of the Southern District of New York has jurisdiction

As this is the court of past and current jurisdiction for the specific Lehman Trust, the LXS 2006-12 N, and further, that there is a Federal question in that the judgment in the Superior Court has been procured by fraud, mistake or misrepresentation in that the all matters pertaining to the LXS 2006-12 Trust (The Lehman XS Trust 2006-12N) have been under the jurisdiction on the U.S. Bankruptcy Court for the Southern District of New York, since 2008 in the ***case In RE Lehman Brothers Holdings, Inc, Et al 415 BR 77 Case # 08-13555 (SCC)*** ("the Lehman Bankruptcy") and thereafter 2018, as well as in the case in New York Supreme Court Index # 651625 ***Petition U.S. Bank National Association, et al as trustees..., et Al), Petitioners, For Judicial Instructions under CPLR Article 77 on the Administration and Distribution of a Settlement Payment ("NY Supreme Court Petition Case").***

1.

**SHORT AND PLAIN STATEMENT, as required by 28 U.S.C. Ss 1446 (a)**

On the part of the plaintiff, there was mistake, fraud, or misrepresentation as Subject Matter Jurisdiction for the LXS 2006-12 N trust was already with, and continues with, the Lehman Bankruptcy Court Case # 1:08-bk-13555..

When the plaintiff's case in Superior Court ( FST CV 13 6020232 S was originally filed on 9/30/2013, the jurisdiction of ALL MATTERS PERTAINING TO THE Plaintiff trust, The "LXS 2006-12 N were already under the jurisdiction of the US Bankruptcy Court for the Southern District of New York, under Judge James Peck. This jurisdiction continues to this day, as has been memorialized and ordered by Judge Melissa Crane of the New York State Supreme Court on July 3 2024. (EXHIBIT 3) This latest ruling is NEW Evidence that reiterated that the jurisdiction of the LXS 2006-12 N Trust remains with the U.S. Bankruptcy Court of the Southern District of New York. From the moment the superior court case was filed on 9/30/2013, it was a mistake, misrepresentation, or fraud upon the state superior court as jurisdiction was already in the U.S. federal courts. As the judgment was procured by fraud, misrepresentation or mistake, the defendant's rights under the 14th Amendment Due Process Rights of the U.S. Constitution have been violated, and the judgment procured by fraud is a violation of the defendant's legal rights under US. Federal Laws 18 USC 241 conspiracy , and 18 U.S.C. under color of law.

**LAW AND ARGUMENT**

**According to U.S. Code Ss 1441 (a) Actions Removable Generally: "except as otherwise provided by an Act of Congress, any civil action brought in a State court of which the district court of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. The Bankruptcy Amendments and Federal Judgeship Act of 1984 established the bankruptcy courts as a unit of the district court. This act granted the District Courts original and exclusive jurisdiction of all cases arising under bankruptcy laws. There are 90 bankruptcy courts , one in each of the 94 Federal judicial districts. U.S. Federal Statute Law establishes which cases may be removed.**

LAW AND ARGUMENT ANALYSIS

**The highly unusual aspect of this removal, is that the Removal is removing the case back to the actual court which has had jurisdiction over this Lehman Trsut, the LXS 2006-12 N, since Judge Peck's order in 2012, in the Case In re Lehman Brothers Holdings, Inc in the U.S. Bankruptcy Court of the S.D. of N.Y.**

Statutory construction supports Removal. Statute Ss 1452 (a) does not expressly proscribe removal from the district court, it prohibited removal only from the Tax Court. In *Gabel V. Engra inc (in Re Engra*Inc.), 86 B.R. 890, 896 ( S.D. Tex. 1988) ("Congress considered removal inappropriate from one federal court, namely the U.S. tax Court...")

Additionally, subpart (a) (1) of the Federal Rules of Bankruptcy Procedure 9027, providing the procedural requirements for removal, states: " An application for removal shall be filed with the clerk for the district and division within which is located the state or *federal court* where the civil action is pending. Id at 896 n.6 ( quoting Fed. R. Bankr. P. 9027 (a) (emphasis added). Likewise, the Advisory Committee Notes to the 1987 Amendments to that Rule provide that Ss. 1452 of Title 28, provides for, with certain exceptions, removal of claims or causes for action in civil actions pending in state or *federal court* when the claim or cause of action is within jurisdiction conferred by 28 U.S. C. Ss 1334 (Id.)

Further, if Congress had intended to disallow removal of district court actions, Congress could easily have incorporated language to that effect. As shown above, the early version of the applicable removal provision explicitly referred to district court actions.

While Statute 1441 the general removal provision specifically limits removal to pending state court cases, however, contrastingly Ss 1452, as stated, does not limit removal to state court cases. (Id. At 896).The change in wording from Ss 1478 (a) to 1452 (a) constitutes only an attempt to comply with Marathon* rather than to attempt to foreclose removal from federal district court to bankruptcy court (id.) **Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982).*

Further, because the term "district court" in the 19844 Act can be interpreted to mean "bankruptcy court" when read in light of the referral provision of 28 U.S.C. Ss 157, authorizing district courts to refer bankruptcy cases to bankruptcy courts , the replacement of the term "bankrupcty court" with the expression "district court" in 28 U.S. C. 1452 arguably effected no substantive change.

*Philadelphia Gold Corp. v. Fauzio (In Re Philadelphia Gold Corp.),* 56 B.R. 87. 89-90 (Bankr. E.D. Pa. 1985)

> See also *MATV-Cable Satellite Inc. V. Phoenix Leasing Inc., 159* B.R. 56, 59 (Bankr. S.D. Fla. 1993)) (" it can be argued that the term "district Court" may be read as "bankruptcy court", since the latter is a unit of the former pursuant to 28 U.S. C. Ss 151.")

Finally, efficiency and pragmatism mandate removal from the district court, especially since the U.S. bankruptcy Court S.D. N.Y. has had jurisdiction, arguably since 2012 ( Judge James Peck order), over the (Lehman Trust) LXS 2006-12 N in the case *In re Lehman Brothers Holdings, Inc.*

The advantage of this removal is that the case moves to the bankruptcy court , which in fact has jurisdiction over the said Lehman Trust, within a few days of the filing for removal under Rule 9027 *MATV, 159B. R. at 60. Meanwhile "* the disadvantage of filing a motion to refer or to implement referral in the district court is that the district judges are overburdened, primarily by criminal cases, which are under intense time constraints and which do not permit the assignment of priority to bankruptcy-related cases that the bankruptcy litigants might like.". *(id.)* Moreover, one should consider the danger of "spending more time arguing about where to try a case than in trying a case.". (Id.) "From the point of view of getting our work done," one court has concluded, "it seems more important we decide where the case should be handled than whether it is laid before us as a removal or referral (*Id.)*

Lastly, it must be asked, why is the trustee, U.S. Bank National Association, desperately trying to get this case back to superior court, when in fact the FBI and the Department of Defense are conducting an investigation into the actions of an attorney for U.S Bank bribing the superior court judge in this case (143 rulings) with a house in Greenwich Ct currently worth about $1.5 million

Thus, the original jurisdiction of this matter was in fact a unit of the district court, the U.S. Bankruptcy Court for the Southern District of NY, therefore the case should be removed back to said court.
therefore this matter may be removed to a district court.

**Per Congress.gov Website:**
" Congress has provided that a state court defendant may remove a case to the Federal Court if the case could have originally been brought in a federal court.". The case was in fact originally brought in a federal court, the U.S. Bankruptcy Court of the Southern District of NY and diversity of parties existed and the amount of the controversy exceeded $75,000.
28 USC SS 1441 allows defendants to remove civil cases from the state court to the federal court if the case could have been filed in the federal court originally, under the general federal removal statue. Further, the defendant invokes FRCP 60 (b).

**Federal Question on Complaint**

On the Complaint itself, there is a presumption that the state court has jurisdiction, however in this case the Federal Court ( U.S. Bankruptcy) already had jurisdiction for all claims, including foreclosures which have to do with the LXS 2006-12 Trust., even though federal courts typically abstain from interfering with foreclosure cases. **The Federal question presented on the face of the plaintiff's complaint is that** subject matter jurisdiction already existed in a Federal Court. As U.S. Bank National Association, as Trustee, was always through the Trustee for the LXS 2006-12 N Trust all through the Lehman Bankruptcy Case ( beginning 9/ 2008) and all through the New York Supreme Court Petition case, until this present day, the Trustee always knew or always should have known that subject matter jurisdiction was with the U.S. Bankruptcy Court of the Southern District of NY.S

**BURDEN OF PROOF SATISFIED BY CERTIFIED COURT DOCUMENTS AND ORDER**

The defendant has attached as Exhibits certified court filings from the New York Supreme Court Case which provide a preponderance of evidence that the jurisdiction for the LXS 2006-12 N Trust, a.k.a. the

Lehman XS Trust 2006-12N has been and continues to be under the US. Bankruptcy Court of the Southern District of NY.

"with regard to the burden of proof seeking removal of a state action, the defendant has provided "competent proof and ( which can) justify its allegations by a preponderance of evidence.' ***Southern Air, Inc v. Chartis Aerospace Adjustment Services, Inc.,*** 2012 U.S. Dist. LEXIS 5781 (D. Conn. 2012)

As in this matter Attorney Jeffrey Knickerbocker is an Officer of the Superior Court of CT, the actions, pursued against me in an action in which the jurisdiction was already in a U.S. Federal Court, which have deprived me of my rights, have been conducted under the "color of law" as described in Title 18 U.S.C. 242

Re Title 18 U.S.C. 241 , conspiracy. Attorney Jeffrey Knickerbocker filed false litigation against me in a state superior court, then his colleague Linda St Pierre filed false claims against me in 2 U.S. bankruptcy Court proceedings, as the proof of claim, and other claims, were based on the judgments of a court which did not have subject matter jurisdiction and the plaintiff U.S. Bank as Trustee, did not have standing.

Every person, under the color of any statute, ordinance, regulation, custom, or usage of any state or territory, or the District of Columbia, subjects or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action in law, suit in equity, or other proper proceeding for redress..."

## RULE 60 (b) RELEVANCE

## Per Judge Sirala Nigala:3:23-cv-01329 SVN

" Rule 60 (b) sets forth a "mechanism for for extraordinary judicial relief invoked only if the moving party demonstrates exceptional circumstances." Under Rule 60 (b) the court may relieve party from a final judgment for the following reasons: " (1) mistake, inadvertence, surprise or excusable neglect: (2) newly discovered evidence that, that , with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59 (b); (3) Fraud (whether previously called

intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied`, released or discharged; it is based on an earlier judgment that has been reversed or vacated, or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

1. **EXCEPTIONAL CIRCUMSTANCES AND NEWLY DISCOVERED/NEW EVIDENCE**

Per Rule 60 (B) as there are exceptional circumstances and newly discovered information and evidence. ( Ruling on 7/03/2024 by Judge Melissa Crane ( **EXHIBIT 3,** CERTIFIED COPY) of the New York State Supreme Court in Case Index # 651625/2018, that all matters pertaining to Lehman XS Trust 2006-12 N are still under the jurisdiction of the U.S. Bankruptcy Court for the Southern District of New York, in the case IN RE: Lehman Brothers Holdings, Inc.,

**From Judge Sirala Nigala in the case of 3:23-cv-01329-SVN**

" a Federal plaintiff can seek to set aside a state court judgment obtained through the extrinsic fraud of the adverse party.".

"If a Federal Plaintiff asserts as a legal wrong an erroneous decision by a state court judgment, there may be Federal Court jurisdiction.".

Further from Judge Sirala Nigala, 3:23-cv-01329-SVN

"Final Judgments should not be lightly reopend," accordingly a Rule 60 (b) motion may be "invoked only upon a showing of exceptional circumstances." *Nemaizer v. Baker*, 793 F.2d 58, 61-62 (2nd Cir. 1986) internal citations and quotations omitted; See also Ruotolo v. City of New York, 514 F.3d 184, 191 (2 nd Cir. 2008) Rule 60 (b) sets forth " a mechanism for extraordinary judicial relief invoked only if the moving party demonstrated exceptional circumstances." ( internal citations and quotations omitted)"

In this instant case, there are exceptional circumstances. The entire action was filed, pursued and litigated without subject matter jurisdiction, ironically by the same trustee which was a party ( as Trustee for various Lehman trusts ) to the Lehman Bankruptcy case Even before this case was filed, subject matter jurisdiction was held by the U.S. Bankruptcy Court for the Southern District of New York : In RE Lehman Brothers Holdings, Inc.,

Further from Judge Sirala Nigala, same case, 12/13/23

(" A federal plaintiff can seek to set aside a state court judgment [sic] obtained through the extrinsic fraud of the adverse party

: Whether by mistake, inadvertence, excusable neglect, misrepresentation or fraud, the state court case was filed without subject matter jurisdiction. Newly discovered evidence , the July 3, 2024 ruling by Judge Melissa Crane concerning the continued jurisdiction of the Federal bankruptcy court fraud,

Applying the state court judgment is no longer equitable as the state court never has subject matter jurisdiction, and the plaintiff had no standing to bring the matter into the state superior court of Connecticut

This case is also exceptional circumstances as there are a number federal criminal agencies looking at this case:

1. **FBI INQUIRY, begins . August 20, 2024 into allegation that Jeffrey Knickerbocker, acting as counsel for the U.S. Bank National Association, as trustee, was involved in a bribe of a Ct Superior Court Judge . The bribe was a house in Greenwich, CT currently worth $1.4 million. Since the allegation was made in early June 2024, neither the judge in question, nor Attorney Knickerbocker have denied the allegations.**
2. **Department of Defense ("DOD"), National Guard Investigation, Attorney Jeffrey Knickerbocker is/ was a JAG officer in the U.S. National Guard, Complaint # below.**

**Federal Bureau of Investigation**

In late August 2024, I was called by the FBI. I had previously sent them information. On August 20, 2024, I returned the call to the FBI. The call lasted for over 35 minute. On Friday September 13, 2024, I received another phone call from the FBI regarding this matter.

**Department of Defense, CASE # 20240822-097846-CASE-01 (AF Case-FRNO 2024-16238).**

In the past several weeks I have been notified by the Department of Defense that an investigation into the actions of Attorney Jeffrey Knickerbocker in among other actions, filing litigation against the defendant when the matter had already been under the jurisdiction of the Bankruptcy Court for 16 years. has commenced, headed by the JAG General, a Two Star General Charles Walker, and Lt. Col. Kathryn Watkins Notification was given via email on September 6, 2024. I spoke to Lt. Col Lindsay Fletcher about the case as well.The DOD shares information concerning such cases with the Department of Justice, as well as other U.S. federal investigative agencies as well as with the party who has brought the allegations to the DOD.

**Further U.S. Federal agencies aware of this case:**

1.U.S. Securities and Exchange Commission, U.S. Bancorp is a publicly trades bank holding company, subject to U.S. Securities laws as well as US federal and State banking laws

2. The U.S. Department of Justice, U.S. Attorney's Office,

3. Internal Revenue Service Division of Criminal Investigations and the

4. I.R.S division on Public Corruption in Utah

**MISTAKE, FRAUD,OR MISCONDUCT BY AN OPPOSING PARTY, AND RES JUDICATA**

Mistake or Fraud of U.S. Bank National Association, as Trustee for the LXS 2006 filing Case # FST CV 13 6020232 S, as all claims should have been brought in the following U.S.Bankruptcy Case in the Southern District of New York, as ordered by Judge James Peck when he ordered that the jurisdiction over such Lehman Trust, including the LXS 2006-12 N was with the Bankruptcy Court of which he was judge. That jurisdiction continues to this day, as again ordered by Judge Melissa Crane of the New York Supreme Court on July 3, 2024

**RELEVANT CERTIFIED COURT DOCUMENTS**

_Defendant's Exhibit 1, Exhibit 2 and Exhibit 3 are Certified court documents from the Clerk's Office for the New York Supreme Court, , Docket Documents #1, # 107, and # 325. ( Court ruling on July 3, 2024.)

In these documents it is reiterated by said Court that the LXS 2006-12 N trustis an asset which was Includedand continues to be included in the jurisdiction of in the Lehman Brothers Bankruptcy case:

**In Re Lehman Brothers Holdings, Inc., et al, 415 BR 77, Case # 08-13555 (SCC),**

presided over by Judge James Peck, in the U.S. District Court for the Southern District of New York. At the end of said case, Judge Peck approved the RMBS Settlement Agreement, which involved both the RMBS Trustees (acting on behalf of the actual trust owners, the "Certificate holders for each trust" and The LBHI Directors ( Lehman Brothers Holdings Inc. Directors) **.As part of his rulings, Judge Peck ordered that all foreclosures in Lehman cases (involving the 238**

**Lehman trusts) , had to be brought into Judge Peck's courtroom.**

Thus, all claims of the Certificate Holders of the LXS 2006-12 N ( the Lehman XS TRUST 2006-12 N), an asset in said Bankruptcy case, In Re: Lehman Brothers Holdings Inc., should have been brought into the US District Court for the Southern District of New York, as of Judge Peck's ruling in 2012.

**Follow Up Case to Lehman Bankruptcy Brought By U.S. Bank and 3 other Trustees**

In 2018 U.S. Bank National Association, as trustee, along with 3 other trustees petitioned the Supreme Court of the State of New York, petitioned said court, in Case Index No. 651625/2018 "For Judicial Instructions under CPLR Article 77 on the administration and Distribution of a Settlement Payout. This petition was received by the court "NYSCEF " on 04/04/2018. **( EXHIBIT 1)**

**(EXHIBIT 2)**

On July 9, 2018, Judge Marcy Friedman, J.S.C. ordered the "CONSENT PARTIAL SEVERANCE **ORDER AND PARTIAL FINAL JUDGMENT" (Docket Document # 107) having to do with . " 208 residential mortgage-backed** securities trusts identified in Exhibit A to the Petition (the Subject Settlement Trusts" "On Exhibit A, on page 10 of 22, trust # 9 is the "LXS 2006-12 N" the subject mortgage trust of the Superior Court Case FST-CV -6020232 S, U.S. Bank National Association as trustee for the LXS 2006-12 N V. O'Hara, Francis. Also on Exhibit A, next to the "LXS 2006-12 N, **U.S. Bank is listed as Payment Administrator and Trustee.**

Also Under Exhibit B, commencing on page 15 or 22, , on page 16 of 22, the trust listed at the Top of page 16 is the "LXS 2006-12 N". Again, U.S. Bank is listed as Payment Administrator and Trustee...

On page 23 of 23, Michael Kraut, John M Vassos and Kurt W. Rademacher are listed as " Attorneys for Petitioner U.S. Bank National Association". This is Case Index No. 651625/2018, filed July 12, 2018 at "N.Y.Co. CLK'S Office. ( see stamp on ***page 23***

**(EXHIBIT 3)**

**On July 3, 2024 , Judge Melissa Crane signed and ordered ( EXHIBIT # 3)**

**STIPULATION AND ORDER .** This is stamped on page top "RECEIVED NYSCEF: 07/03/2024". On Page 3 Kurt w. Rademacher and Michael S. Kraut are listed as " Attorneys for U.S. Bank National Association" .Thus, U.S. Bank, the plaintiff trustee herein very much knew that they should not have proceeded in Ct State Superior Court and are perpetrating a Fraud or proceeding on a mistake on this Court.

**On Page 1 of said document " Stipulation and Order, , paragraph 2, the Judge notes "the court ruled its resolution of certain disputed issues required interpretation of agreements over which the *U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") had retained jurisdiction".***

The Plaintiff knew or should have known that as the Lehman XS Trust 2006-12 N was part of the litigation of one of the largest and most famous bankruptcy cases, a case pending in US Bankruptcy court and they have been proceeding in the **WRONG COURT**, in the **WRONG STATE**, **WRONG JURISDICTION.** The state superior court of CT did not and does not have subject matter jurisdiction over this case. The plaintiff does not have standing to bring said case in the superior court of CT.

**CONCLUSION**

Wherefore, In light of all of the above mentioned U.S. laws, specifically 28 U.S.C. 1441(a) and (b) and the bankruptcy Amendments and Federal Judgeship Act of 1984, as well as a preponderance of evidence in the form of certified court documents and an order, as well as considering the defendants 14th Amendment, U.S. Constitutional due process rights, the defendant hereby requests the US bankruptcy Court of the Southern District to allow this Removal Action to proceed in U.S. Bankruptcy Court for the Southern District of New York. Although the defendant had removed this case to the U.S. District Court for Connecticut, the defendant recently discovered that he could remove this case from the US District Court to the US. Bakruptcy Court, which according to numerous court rulings , is the court of subject matter jurisdiction for the LXS 2006-12 N trust

Edward O'Hare

Edward O'Hara

Defendant :Edward O'Hara. 1414 King St, Greenwich, CT 06831 (203) 550 1701,eo.greenwicha
ltcapital@gmail.com

**UNITED STATES** BANKRUPTCY **COURT** OF THE

SOUTHERN **DISTRICT OF** NEW YORK, EJO.

**CASE No.:___________**

REMOVAL FROM: U.S. DISTRICT COURT OF C.T. CASE # 24-CV-1546 OAW

**Docket # FST-CV-13-6020232S** **Superior Court** EJO.

**U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE**

**FOR THE LXS 2006-12N**

**V.**

**O'HARA, FRANCIS** OCTOBER 30, **2024**

**AFFIDAVIT IN SUPPORT OF REMOVAL OF ACTION TO THE** U.S. BANKRUPTCY **COURT** OF THE SOUTHERN DISTRICT OF NEW YORK. EJO

I, Edward O'Hara, hereby verify that I have firsthand personal knowledge of the foregoing Notice of Removal, and the statements made by me therein ae true and correct to the best of my knowledge, and I make these statements freely without aid or assistance, under penalty of perjury of the laws of the United States of America, per 28 U.S.C. Ss 1746, EJO.

Respectfully,

_Edward O'Hara_ 10/30/2024.

Edward O'Hara. P.O. Box 4974, Greenwich, CT 06831 (203) 550 1701,
eo.greenwichaltcapital@gmail.com

10/30/2024

GEORGIANA ROTHWEILER
NOTARY PUBLIC
MY COMM. EXP. 4/30/2029
CONNECTICUT

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**REMOVAL FROM U.S. DISTRICT COURT # 3:24-cv-01546**

**EDWARD O'HARA**

11/06/2024

**MOVANT**

**CASE NAME:**

**U.S. BANK NATIONAL, as Trustee for the LXS 2006-12 N Trust V. O'HARA FRANCIS, O'HARA, EDWARD, Et Al**

**Case # FST CV 13 6020232 S**

**LINDA RIFFKIN**

**U.S. TRUSTEE,U.S. Bankruptcy Court, Southern District of NY**

**<u>NOTICE OF APPEARANCE AND DEMAND FOR SERVICE OF PAPERS</u>**

Please take notice that the undersigned hereby enters an appearance for Edward O'Hara, a defendant and party in interest for the above captioned case .and pursuant to Bankruptcy Rules 2002 and 9007, and Section 1109 (b) of the Bankruptcy Code, respectfully demands that all notices given or required to be given be served upon the undersigned at the address, email and telephone number: Edward O'Hara, 1414 King St. Greenwich, CT 06831.

( email: eo.greenwichaltcapital@gmail.com) Tel : 203.550.1701

Edward O'Hara

DEFENDANT: Edward O'Hara. 1414 King St. Greenwich, CT 06831 (203) 550 1701, Email address: eo.greenwichaltcapital@gmail.com

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**REMOVAL FROM U.S. DISTRICT COURT # 3:24-cv-01546**

11/06/2024

**EDWARD O'HARA**

**MOVANT**

**CASE NAME:**

**U.S. BANK NATIONAL, as Trustee for the LXS 2006-12 N Trust V. O'HARA FRANCIS, O'HARA, EDWARD, Et Al, Case # FST CV 13 6020232 S**

**DISCLOSURE STATEMENT**

The defendant Edward O'Hara is a self- represented party defendant.

Edward O'Hara

DEFENDANT: Edward O'Hara. 1414 King St. Greenwich, CT 06831 (203) 550 1701, Email address: eo.greenwichaltcapital@gmail.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**EDWARD O'HARA** Nov. 6, 2024 **2024**

**MOVANT**

**U.S. Bank National ASSOCIATION as Trustee for the LXS 2006-12 N V. O'Hara, Francis, O'Hara, Edward, Et Al**

## CERTIFICATE OF SERVICE

**In accordance with the applicable provisions of the Federal Rules of Bankruptcy Procedure, the undersigned certifies that on the** 6th **day of** NOVEMB **2024 the following documents were served on the U.S. Trustee and all appearing parties by first class mail or by email delivery.**

**Documents served:**

**Notice of Removal, Disclosure Statement, Appearance, Affidavit in Support of Removal Action, Certification of Service**

Edward O'Hara

DEFENDANT: Edward O'Hara. 1414 King St. Greenwich, CT 06831 (203) 550 1701,

Email address: eo.greenwichaltcapital@gmail.com

Linda A. Riffkin

Assistant U.S. Attorney/ Region 2

Office of the US Trustee

Alex. Hamilton Custom House

One Bowling Green, Ste 534

NY NY 10004-1408

USTPregion02.nh.ecf.usdoj.gov

U.S. Trustee Office

150 Court St, Ste 302

New Haven, CT 06510

Attorneys for U.S. Bank National Association:

Morgan, Lewis and Bockius LLP

Kurt Rademacher

101 Park Avenue

New York, NY 10178

T 212 309 6000

| | |
|---|---|
| RETURN DATE: October 29, 2013<br>DOCKET NO.: | SUPERIOR COURT<br>JUDICIAL DISTRICT<br>OF STAMFORD-NORWALK |
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE LXS 2006-12N | AT STAMFORD |
| VS. | September 30, 2013 |
| FRANCIS O'HARA A/K/A FRANCIS G. O'HARA<br>EDWARD J. O'HARA<br>DEPARTMENT OF THE TREASURY-INTERNAL REVENUE SERVICE<br>STATE OF CONNECTICUT- DEPARTMENT OF REVENUE SERVICES<br>MARK H. HENDERSON, ESQ.<br>WOFSEY, KWESKIN & KURIANSKY, LLC | |

**COMPLAINT**

1. On May 6, 2006, Defendant, Francis O'Hara, promised to pay to the order of MortgageIt, Inc., the principal sum of $695,900.00, as evidenced by a promissory note for said sum, dated on said date, and payable to the order of MortgageIt, Inc., with interest from said date, in monthly installments of principal and interest.

2. On said date, by deed of that date, Defendants, Francis O'Hara and Edward J. O'Hara, to secure the Note, mortgaged to Mortgage Electronic Registration Systems, Inc. as nominee for MortgageIt, Inc., the premises known as 1414 King Street, Greenwich, Connecticut as described in Exhibit A attached hereto and made a part of.

3. Said mortgage deed was recorded May 10, 2006, in Volume 5171 at Page 219 of the Greenwich Land Records.

4. The Note is owned by Plaintiff, U.S. Bank National Association, as trustee for the LXS 2006-12N.

5. The Mortgage is owned by Plaintiff, by virtue of an Assignment of Mortgage, dated August 10, 2011 and recorded August 31, 2011 in Volume 6197 at Page 115 of the Greenwich Land Records.

6. The installment of principal and interest was due on December 1, 2012, and each and every month thereafter has not been paid, and Plaintiff has exercised its option to declare the entire balance due on the note due and payable.

7. Defendant, Department of the Treasury- Internal Revenue Service, claims, or may claim, an interest in the property by virtue of a federal tax lien in the principal amount of $21,257.98, recorded on July 26, 2010 in Volume 5983 at Page 291 of the Greenwich Land Records, which lien is subordinate and inferior in right to Plaintiff's mortgage interest.

8. Defendant, State of Connecticut- Department of Revenue Services, claims, or may claim, an interest in the property by virtue of a state tax lien in the principal amount of $9,460.87, recorded on October 7, 2010 in Volume 6020 at Page 80 of the Greenwich Land Records, which lien is subordinate and inferior in right to Plaintiff's mortgage interest.

9. Defendants, Mark H. Henderson, Esq., and Wofsey, Kweskin & Kuriansky, LLC, claim, or may claim, an interest in the property by virtue of a judgment lien in the principal amount of $17,975.81, recorded on January 19, 2011 in Volume 6087 at Page 230 of the Greenwich Land Records, which lien is subordinate and inferior in right to Plaintiff's mortgage interest.

10. The following parties claim an interest in the Property prior in right to the interest of Plaintiff:

    a. Town of Greenwich for taxes for any previous year now due and all subsequent years not yet due.

    b. Town of Greenwich for sewer use charges for the calendar years not yet due; and any previous year now due;

    c. Greenwich Tax District for tax district fees, if applicable.

**WHEREFORE,** Plaintiff prays for the following relief:

1. Foreclosure of the mortgage;
2. Immediate possession of the mortgaged premises;
3. Entry of deficiency judgment against Defendant, Francis O'Hara;
4. The appointment of a receiver to collect the rents and profits accruing from the premises;
5. Costs of this action;
6. Attorney's fees; and
7. Such other and further relief as the court may deem just and equitable.

Plaintiff,
U.S. BANK NATIONAL ASSOCIATION,
AS TRUSTEE FOR THE LXS 2006-12N
By its Attorney,

Amanda Tiernan, Esq.
Marinosci Law Group, P.C.
1350 Division Road, Suite 301
West Warwick, RI 02893
(401) 234-9200
Juris No. 416403

# EXHIBIT A

**ALL THAT CERTAIN** tract, piece or parcel of land, together with the building and improvements thereon, situated in the Town of Greenwich, County or Fairfield and State of Connecticut, bounded:

| | |
|---|---|
| **WESTERLY:** | **One hundred fifty-two (152) feet**, more or less, by land now or formerly of the State of Connecticut being formerly known as Interstate Route 67, now known as Interstate 684; |
| **SOUTHERWESTLY:** | **One hundred ninety-two (192) feet**, more or less, by the division line between the State of New York and the State of Connecticut; |
| **SOUTHEASTERLY:** | **One hundred thirty-four (134) feet**, more or less, by land now or formerly of Marietta V. Field; and |
| **NORTHEASTERLY:** | **Three hundred eighteen (318) feet**, more or less, by the highway King Street. |

**Said Premises are also known as 1414 King Street, Greenwich, CT 06831**

# EXHIBIT 1

No. 1598452

# Certification

STATE OF NEW YORK, COUNTY OF NEW YORK, SS:

I, Milton Adair Tingling, County Clerk and Clerk of Supreme Court New York County,

do hereby certify that on September 23, 2024 I have compared

the document attached hereto,

PETITION page(s) 35

with the originals filed in my office and the same is a correct transcript

therefrom and of the whole of such original in witness

whereto I have affixed my signature and seal.

Milton Adair Tingling

MILTON ADAIR TINGLING
NEW YORK COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the matter of the application of

U.S. BANK NATIONAL ASSOCIATION, WELLS FARGO BANK, NATIONAL ASSOCIATION, WILMINGTON TRUST, NATIONAL ASSOCIATION, WILMINGTON TRUST COMPANY, and CITIBANK, N.A., (as Trustees, Indenture Trustees, Securities Administrators, Paying Agents, and/or Calculation Agents of Certain Residential Mortgage-Backed Securitization Trusts),

Petitioners,

For Judicial Instructions under CPLR Article 77 on the Administration and Distribution of a Settlement Payment.

Index No.

**PETITION**

Petitioners U.S. Bank National Association ("U.S. Bank"); Wells Fargo Bank, National Association ("Wells Fargo"); Wilmington Trust, National Association ("WT"), Wilmington Trust Company ("WTC", and collectively with WT, "Wilmington Trust"); and Citibank, N.A. ("Citibank"), solely in their respective and various capacities as trustees, indenture trustees, successor trustees, securities administrators, paying agents, and/or calculation agents (collectively, the "Petitioners") of the residential mortgage-backed securitization trusts listed on Exhibit A hereto (each a "Subject Settlement Trust" and collectively, the "Subject Settlement Trusts"), as and for their Petition (the "Petition") for judicial instructions under Article 77 of the New York Civil Practice Law and Rules ("CPLR"), allege as follows:

## INTRODUCTION

1. Certain of the Petitioners and other parties[1] (the "Accepting Trustees"), acting as trustees, indenture trustees, or separate trustees on behalf of certain residential mortgage-backed security trusts (the "Covered Loan Settlement Trusts"), accepted a settlement offer dated as of November 30, 2016 and modified as of March 17, 2017 (the "Covered Loan Settlement Agreement")[2] by and among a group of institutional investors and Lehman Brothers Holdings Inc. and other debtors (collectively, the "LBHI Debtors") in the bankruptcy cases in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), styled or related to *In re Lehman Brothers Holdings Inc., et al.* Chapter 11 Case No. 08-13555 (the "Bankruptcy Proceeding").

2. The Covered Loan Settlement Agreement provided a mechanism to resolve claims asserting breaches of representations and warranties against the LBHI Debtors concerning loans in the Covered Loan Settlement Trusts.

3. Pursuant to the Covered Loan Settlement Agreement, the LBHI Debtors agreed to participate in an estimation proceeding (the "Estimation Proceeding") before the Bankruptcy Court to establish the aggregate amount of allowed claims of the Covered Loan Settlement Trusts (the "Allowed Claim"). After the Bankruptcy Court, based on a formula in the Covered Loan Settlement Agreement, established the Allowed Claim, an allocable portion of the distributions on the Allowed Claim (the "Covered Loan Settlement Payment")[3] is to be

---

[1] U.S. Bank, Wilmington Trust and Deutsche Bank National Trust Company, together with TMI Trust Company ("TMI"), as successor to Law Debenture Trust Company of New York ("Law Debenture"), as separate trustee for the trusts for which Wells Fargo acts as trustee, were parties to the Covered Loan Settlement Agreement. TMI does not have any role in the trusts related to the issues in this Petition. Therefore, TMI is not one of the Petitioners

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Covered Loan Settlement Agreement. Attached hereto as Exhibit B is a copy of the Covered Loan Settlement Agreement.

[3] The Covered Loan Settlement Payment will be reduced by the amount of the Settlement Payment that would have been distributed to certain excluded trusts had they not been excluded from the Covered Loan Settlement Agreement. *See* Settlement Agreement, § 3.02(a).

transferred to each Covered Loan Settlement Trust. The Covered Loan Settlement Payment is thereafter to be distributed to the holders of certificates, notes, or other securities[4] (the beneficial owners thereof, "Certificateholders") issued by the Covered Loan Settlement Trusts[5] pursuant to distribution provisions in the Covered Loan Settlement Agreement and the governing agreements for the Covered Loan Settlement Trusts.

4. The Accepting Trustees, on behalf of certain residential mortgage-backed security trusts (the "Transferor Loan Settlement Trusts"), some of which were also Covered Loan Settlement Trusts, also entered into a separate settlement agreement with the LBHI Debtors, dated September 5, 2017 and executed and accepted on October 13, 2017, to resolve breach of representation and warranty claims concerning loans originated by third parties and acquired by the LBHI Debtors before being deposited into the Transferor Loans Settlement Trusts (the "Transferor Loan Settlement Agreement"). Pursuant to that agreement, the LBHI Debtors agreed to an allowed unsecured claim in the Bankruptcy Proceeding of an amount equal to $13,000,000, plus interest (the "Transferor Loan Settlement Payment," and collectively with the Covered Loan Settlement Payment, the "Settlement Payments").[6] The Transferor Loan Settlement Agreement

---

[4] The term "certificates" is used in this Petition to refer to certificates, notes, or any other applicable securities.

[5] For each Subject Settlement Trust (which include both certain Covered Loan Settlement Trusts and Transferor Loan Settlement Trusts) the applicable governing agreements designate a party with the role of being responsible for all aspects of calculation, administration, and distribution of any payments for Certificateholders (defined herein for reference as, the "Payment Administrator"). The Payment Administrator is therefore the party that will administer and distribute the Settlement Payments. For some Subject Settlement Trusts, the Payment Administrator role is included within the role of the Trustee and performed by the Trustee. For other Subject Settlement Trusts, the Payment Administrator is a separate role performed by a securities administrator, paying agent, or calculation agent that is not the same party as the Trustee. Where the party performing the Payment Administrator role is different than the Trustee, the Petitioners are bringing this Petition in their respective and separate capacities as Payment Administrators and Trustees. Exhibit A hereto lists the Payment Administrator and Trustee for each Subject Settlement Trust.

[6] Attached hereto as Exhibit C is a copy of the Transferor Loan Settlement Agreement. The provisions in the Transferor Loan Settlement Agreement addressing the distribution of the Transferor Loan Settlement Payment to Trust beneficiaries are substantively identical to the distribution provisions in the Covered Loan Settlement Agreement.

and the Covered Loan Settlement Agreement are referred to collectively herein as the "Settlement Agreements."

5. The Petition concerns the administration and distribution of the Settlement Payment (the "Settlement Payment Application Process") with respect to the Subject Settlement Trusts listed on Exhibit A hereto.[7]

6. Each Subject Settlement Trust holds or owns one or more pools or groups (and in some instances subpools or subgroups) of residential mortgage loans.[8] On or around the date the Subject Settlement Trusts were created, they issued multiple classes of certificates sold to investors, the proceeds of which were used to purchase such mortgage loans. Pursuant to the agreements governing the Subject Settlement Trusts (the "Governing Agreements"),[9] the certificates represent an undivided interest in, or are otherwise secured by, the mortgage loans in the Subject Settlement Trusts.

7. Each certificate generally has, or is assigned, a certificate principal balance equal to the total distribution of "principal amount" such certificate is entitled to receive. Collections of "principal funds" received from the underlying mortgage loans and certain other collections are generally used to satisfy the total principal amount due to certificates. Certificates cannot receive distributions of principal amount in excess of their original aggregate or total certificate

[7] The Covered Loan Settlement Agreement and the Transferor Loan Settlement Agreement also cover certain residential mortgage-backed securitization trusts that are not subject to this Petition (the "Non-Subject Settlement Trusts"). For the Non-Subject Settlement Trusts, the applicable Petitioners individually and respectively determined that, at this time, there are no material issues concerning the administration and distribution of the Settlement Payments that warrant judicial instruction, and the relief sought in this Petition is not intended to apply to the Non-Subject Settlement Trusts. Attached hereto as Exhibit D is a schedule listing the Non-Subject Settlement Trusts, which are not the subject of this Petition.

[8] For ease of reference, "loan group" is used herein to refer to loan groups, subgroups, pools, subpools, and any other applicable grouping, pooling, or assemblage of loans.

[9] The Governing Agreements for the Subject Settlement Trusts usually include a "trust agreement" (a "Trust Agreement") or an "indenture." Because the total volume of the Governing Agreements is thousands of pages in length, the Petitioners will provide the Court with a compact disc containing electronic versions of the Governing Agreements.

principal balance. Each certificate also generally is entitled to receive a stated amount of interest distributions. The Governing Agreements contain specific "waterfall" provisions that dictate the principal amounts and interest amounts distributable to classes of certificates and the order or priority in which such amounts are distributed among such classes.

8. With respect to distributions of principal amount, junior classes of certificates typically are not entitled to receive principal amounts until the classes of certificates senior to them have been paid in full.[10] Generally, "Class A" is the most senior class and thereby the first class of certificates entitled to principal distributions, "Class M" is more junior and the second class entitled to principal distributions, and "Class B" is even more junior and the third class entitled to principal distributions. For some Subject Settlement Trusts, there is only a single class of Class A certificates, but, for many of the Subject Settlement Trusts, there are multiple classes comprising Class A, *e.g.*, there are "Class A-1," "Class A-2," and "Class A-3" certificates.

9. Each time a class of certificates receives a distribution of principal amount, the Governing Agreements require a corresponding reduction of the certificate principal balance to reflect the amount of the distribution received.

10. Some Subject Settlement Trusts (the "OC Trusts") have an "overcollateralization" structure whereby the initial aggregate mortgage loan balances are greater than the initial aggregate certificate principal balances of certain classes of certificates.[11] Overcollateralization

---

[10] For most of the Subject Settlement Trusts, the distributions described herein are performed under a waterfall that is in effect following a waterfall "trigger event," which generally is tied to the occurrence of cumulative realized losses or mortgage loan delinquencies reaching a certain specific percentage.

[11] Certain of the OC Trusts make use of an undercollateralization structure. In these trusts, principal distributions can flow through a waterfall other than the ordinary principal amount waterfall when the certificate principal balance of a senior certificate or group of senior certificates exceeds the balance of the related mortgage loans. These distributions typically require that funds that would otherwise be payable to subordinate certificateholders be used to pay down the principal balances of the undercollateralized senior certificates instead.

is intended to function as credit enhancement. For these OC Trusts, principal funds collected on mortgage loans can sometimes be distributed as "excess cashflow" instead of principal amount. Excess cashflow is distributed under a waterfall separate from the principal amount waterfall and may be distributed to pay, among other things, the unpaid principal balance of senior certificate classes, unpaid realized loss amounts, interest shortfalls, and/or basis risk shortfalls.

11. In certain circumstances, a Subject Settlement Trust may subsequently receive funds constituting a recovery of a realized loss in respect of mortgage loans previously allocated to the certificates—referred to in the Governing Agreements for most Subject Settlement Trusts as a "subsequent recovery." When a subsequent recovery is realized, the principal balances of certificates previously written down may be increased, or "written up," by the amount of the subsequent recovery. This "write-up" accounts for the recovery of a realized loss with respect to the mortgage loans that previously caused a decrease, or "write-down," in certificate principal balances. The Governing Agreements generally provide a specific method by which to apply such subsequent recovery write-ups to the certificates. Additionally, the Governing Agreements contain waterfall provisions concerning the treatment and distribution of funds constituting subsequent recoveries. Most often, subsequent recovery funds are treated as collections of principal funds from mortgage loans and may be distributed as either principal amounts or excess cashflow. The class of certificates entitled to distributions derived from any subsequent recovery may not to be, and oftentimes is not, the same class of certificates that is written-up in connection with such subsequent recovery.

12. Here, the Settlement Agreements provide that the Petitioners are to distribute the Settlement Payments "pursuant to the terms of the Governing Agreements, for further distribution in accordance with the relevant provisions of the Governing Agreements as though

such Plan Payments are a subsequent recovery available for distribution on the related distribution date . . . ." *See* Covered Loan Settlement Agreement, § 3.06(a).[12]

13. The Settlement Agreements further provide that "to the extent permitted under each Trust's Governing Agreement, the applicable [Petitioner] . . . will apply the amount of the Plan Payment for that Trust to increase the balance of securities within that Trust . . . in the reverse order of previously allocated losses . . . ." *See* Covered Loan Settlement Agreement, § 3.06(b).

14. As described in detail below, the Petitioners have identified issues concerning (i) the order of operations in applying the distribution of the Settlement Payment and the write-up of certificate principal balances in connection therewith, and (ii) the treatment of certain certificate classes that currently have, or will have in the future, a principal balance of zero. The resolution of these issues is expected to affect which classes of certificates will receive distributions derived from the Settlement Payments, and the amounts they will receive. The resolution of these issues is also expected to affect which classes of certificates are written up and the extent of such write-ups of certificate principal balances resulting from the distribution of the Settlement Payment, the amount of such write-ups, and, ultimately, the resulting certificate principal balances of the affected classes. The impact of these issues has the potential to be significant in at least some of the Subject Settlement Trusts. In addition, certain Subject Settlement Trusts may be subject to a "close-out call" during the pendency of this Petition, whereby the designated party to the Governing Agreements purchases the remaining assets of the trust, which terminates the trust. The impact of such a "close-out call" on the distribution of the Settlement Payments is currently unclear.

---

[12] Plan Payments as defined in the Covered Loan Settlement Agreement are Settlement Payments as defined in this Petition.

15. The Petitioners have filed this Petition to seek clarification and instruction from this Court concerning the Settlement Payment Application Process, and to provide Certificateholders in the Subject Settlement Trusts and other interested parties in the Subject Settlement Trusts an opportunity to express their views.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction under CPLR Articles 4 and 77 to entertain a special proceeding to determine any matter relating to any express trust. The Subject Settlement Trusts are all express trusts within the meaning of CPLR Article 77.

17. The laws of the State of New York govern the rights and obligations of the Petitioners and the Certificateholders under the Governing Agreements, and, upon information and belief, many Certificateholders are citizens of New York.

18. Venue is proper in this Court under CPLR 503 because one of the Petitioners, Citibank, has its principal place of business in New York County.

**BACKGROUND CONCERNING THE SETTLEMENT AGREEMENT**

19. On June 1, 2017, the Accepting Trustees accepted the Covered Loan Settlement Agreement. The Accepting Trustees thereafter sought approval of their acceptance of this agreement on behalf of the Covered Loan Settlement Trusts before the Bankruptcy Court, which retained jurisdiction over the LBHI Debtors and claims against them.

20. As provided for in the Covered Loan Settlement Agreement, consideration for the release of Covered Loan Settlement Trusts' claims against the LBHI Debtors consisted of an allowed general unsecured claim in the Bankruptcy Proceeding against the LBHI Debtors in an amount to be determined by the Bankruptcy Court in the Estimation Proceeding. The LBHI Debtors agreed in the Covered Loan Settlement Agreement to seek an estimation of the allowed

claim at a total amount of $2.416 billion, to be reduced by an amount allocable to any trusts that were the subject of the settlement offer but did not become Covered Loan Settlement Trusts, or terminated after accepting the offer. Under the terms of the Covered Loan Settlement Agreement, the Bankruptcy Court's decision could be appealed by the Trustees only if the estimation was for an amount less than $2 billion. *See* Covered Loan Settlement Agreement, § 3.02. The LBHI Debtors waived their right to appeal the Bankruptcy Court's decision. *Id.*

21. Each Covered Loan Settlement Trust's share of the allowed claim (its "Allocable Share") would be distributed in subsequent distributions ("Plan Payments") under the LBHI Debtors' third amended joint chapter 11 plan confirmed by the Bankruptcy Court on December 6, 2011. *See* Covered Loan Settlement Agreement §§ 1.27, 1.28, 3.06.

22. In return, the Covered Loan Settlement Agreement called for the Accepting Trustees to release, on behalf of any accepting trust, claims concerning breaches of representations and warranties made by the LBHI Debtors concerning loans in the trusts.

23. On July 6, 2017, the Bankruptcy Court approved the Covered Loan Settlement Agreement and found that "[e]ach of the . . . Trustees acted within the bounds of its discretion, reasonably, and in good faith with respect to its evaluation and acceptance of the RMBS Settlement Agreement concerning the applicable Accepting Trust(s)." *In re Lehman Brothers Holdings Inc., et al.*, Dkt. # 55706, Order Approving RMBS Settlement Agreement and Including Certain Proposed Findings of Fact and Conclusions of Law (July 6, 2017), at 3-4 (Chapman, J.).

24. Subsequently, on October 13, 2017, the Accepting Trustees entered into the Transferor Loan Settlement Agreement, releasing claims in respect of Transferor Loans held in

the Transferor Loan Settlement Trusts in return for an allocable share of an allowed claim of $13,000,000. *See* Transferor Loan Settlement Agreement, § 3.01.

25. The estimation proceeding with respect to the Covered Loan claims began before the Bankruptcy Court on November 20, 2017. The Trustees and LBHI Debtors each presented evidence concerning the proper valuation of the Allowed Claim, with the LBHI Debtors seeking an Allowed Claim of $2.38 billion (the amount contemplated by the Covered Loan Settlement Agreement, reflecting certain trusts that did not accept that agreement or that terminated after accepting that offer prior to the estimation proceeding).

26. On March 8, 2018, the Bankruptcy Court issued a decision from the bench, setting an allowed claim with respect to the claims at issue in the Covered Loan Settlement Agreement of $2.38 billion. A copy of the Bankruptcy Court's order estimating and allowing the Allowed Claims is attached hereto as Exhibit E. As a result of the Bankruptcy's Court's ruling, as contemplated by the Covered Loan Settlement Agreement, the Allowed Claim amount is final, and no party may appeal its decision.

27. As contemplated by the Covered Loan Settlement Agreement, an expert firm retained by the Accepting Trustees calculated the Allocable Shares of the Allowed Claims for each of the Covered Loan Settlement Trusts. A copy of an April 2, 2018 notice to Certificateholders setting forth those Allocable Shares is attached hereto as Exhibit F.

28. The LBHI Debtors have scheduled the next distribution of Plan Payments for April 5, 2018. Petitioners are informed and believe that this distribution will include payments Settlement Payments in respect of the Subject Settlement Trusts.

## KEY SETTLEMENT PAYMENT TERMS OF THE SETTLEMENT AGREEMENT

29. Upon the Accepting Trustees' receipt of the Settlement Payments with respect to the Subject Settlement Trusts, the Settlement Agreements provide that each Accepting Trustee "shall use its reasonable best efforts to distribute the amounts received from the LBHI Debtors on account of the Allocable Shares of the Net Allowed Claim promptly." *See* Covered Loan Settlement Agreement, § 3.01.

30. The Covered Loan Settlement Agreement further provides, "Notwithstanding the foregoing, to the extent that any Accepting Trustee or other party responsible for calculating or distributing Plan Payments for a given Trust forms a good-faith belief that guidance from a court is necessary or appropriate for resolving ambiguities or disputes concerning the distribution of Plan Payments, the Accepting Trustee or other party responsible for calculating or distributing such Plan Payments shall have the right to seek guidance from a court of competent jurisdiction before distributing those amounts." *Id.*

31. Section 3.06(a) of the Covered Loan Settlement Agreement provides the following concerning the distribution of the Settlement Payments:

> Plan Payments on each Participating Trust's Allocable Share shall be deposited into the related Trust's collection or distribution account pursuant to the terms of the Governing Agreements, for further distribution in accordance with the distribution provisions of the Governing Agreements as though such Plan Payments are a subsequent recovery available for distribution on the related distribution date; and further provided that if the Governing Agreement for such a Trust does not include the concept of "subsequent recovery," Plan Payments to such Trust shall be distributed as though they are unscheduled principal available for distribution on the related distribution date), subject to Section 3.04.[13]

32. As discussed above, the then-outstanding certificate principal balances of certain certificates in each Subject Settlement Trust generally will, pursuant to the Governing

[13] *See also* Transferor Loan Settlement Agreement, § 3.06(a).

Agreements, also need to be written up in the amount of the applicable Allocable Share of each Plan Payment to account for such additional funds (the "Settlement Payment Write-Up").

33. Section 3.06(b) of the Covered Loan Settlement Agreement provides the following concerning the Settlement Payment Write-Up:

> In connection with the distribution of Plan Payments to Participating Trusts pursuant to Subsection 3.06(a), <u>to the extent permitted under each Trust's Governing Agreement</u>, the applicable Accepting Trustee, or the party responsible for calculating certificate balances pursuant to the terms of the Governing Agreements of a given Participating Trust, will apply the amount of the Plan Payment for that Trust to increase the balance of securities within that Trust (other than any class of REMIC residual interests) in the reverse order of previously allocated losses, as though such Plan Payment was a subsequent recovery; and further provided that if the Governing Agreement for a particular Participating Trust does not include the concept of "subsequent recovery," <u>to the extent permitted under each Trust's Governing Agreement</u>, the securities for such Trust shall be increased, in reverse order of previously allocated losses, as though the Plan Payment was distributed as though it was unscheduled principal), but in each case by not more than the amount of such losses previously allocated to that class of securities pursuant to the Governing Agreements. (Emphasis added.)[14]

**THE ORDER OF THE DISTRIBUTION OF THE SETTLEMENT PAYMENT AND THE WRITE-UP OF CERTIFICATE PRINCIPAL BALANCES**

34. As shown above, Section 3.06 of the Settlement Agreements specifies two operations that must be performed in connection with the Settlement Payment: (i) the distribution of the funds constituting Settlement Payments to Certificateholders, and (ii) the writing up of certificate principal balances in the amount of the Settlement Payment Write-Up. What is left unaddressed, however, is whether or the Governing Agreements themselves require the Petitioners to apply the Settlement Payment Write-Up *after* making a distribution of the Settlement Payment to Certificateholders of those Subject Settlement Trusts, or *before* determining principal distribution amounts for each class of Certificateholders.

[14] *See also* Transferor Loan Settlement Agreement, § 3.06(b).

35. As a result, the Petitioners are faced with two different possible approaches to perform these operations: the Petitioners could first distribute funds constituting the Settlement Payments based on certificate principal balances that do not account for the Settlement Payment Write-Up and thereafter apply the Settlement Payment Write-Up to the pertinent certificate principal balances (the "Pay First Method"); or, in the alternative, first apply the Settlement Payment Write-Up to the pertinent certificate principal balances and thereafter determine the distribution of the Settlement Payments based on the newly written up certificate principal balances (the "Write-Up First Method").

36. For trusts with Governing Agreements that clearly specify a particular order of operations, the foregoing issue is not problematic—Petitioners intend to follow the provisions of the Governing Agreements for such trusts. However, the Governing Agreements for the Subject Settlement Trusts listed on Exhibit A hereto do not clearly specify whether the Petitioners should use the Pay First Method or the Write-Up First Method in this circumstance. Given the unusually large amount of money to be distributed in connection with the Settlement Payments, whether the Petitioners use the Pay First Method or Write-Up First Method may have a significant impact on the distribution of the Settlement Payments and the resulting certificate principal balances following such distribution.

**(i) Potential For Settlement Payments To Be Distributed As Excess Cashflow**

37. In most Subject Settlement Trusts, subsequent recoveries are treated as principal funds collected on mortgage loans or similar funds. Principal funds are typically distributed as principal amount on certificates. However, the OC Trusts have an overcollateralization structure whereby in certain circumstances a portion of principal funds can sometimes be distributed under the excess cashflow provisions.

38. In the OC Trusts, the initial aggregate mortgage loan balances (the collateral or assets of the trust) are greater than the initial aggregate certificate principal balances of the Class A, Class M, and Class B certificates (the liabilities of the trust). The excess of aggregate mortgage loan balances over the aforementioned aggregate certificate principal balances as of any date is often referred to as the "overcollateralization amount." *See, e.g.*, SASCO 2005-GEL2 PSA, § 1.01, Definition of Overcollateralization Amount. The OC Trusts also have a specific class of certificates with an initial certificate principal balance equal to the initial overcollateralization amount.[15] These classes are usually designated as Class X (referred to herein for reference as, "Class X"), and the certificate principal balances of such classes are not included in the calculation of the overcollateralization amount. *See, e.g.*, *id.* § 1.01, Definition of Overcollateralization Amount.

39. The OC Trusts also have a specified "overcollateralization target" representing the dollar amount that the OC Trust has "targeted" to be overcollateralized as of each period. *See, e.g.*, *id.* § 1.01, Definition of Targeted Overcollateralization Amount. Any overcollateralization amount in excess of the specified target constitutes "overcollateralization release amount," which is typically distributed as excess cashflow, and which as a result may not be distributed as principal amount in any given month. *See, e.g.*, *id.* §§ 1.01, Definition of Monthly Excess Cashflow, Definition of Aggregate Overcollateralization Release Amount, 5.02(d).

40. As a result of cumulative losses realized on the mortgage loans in the OC Trusts, many of the OC Trusts have little or no current overcollateralization amount, meaning that the aggregate mortgage loan balances are less than or equal to the aggregate certificate principal

[15] These certificates may also have an additional notional balance that generally would not impact whether they receive any portion of the Settlement Payment.

overcollateralization target would constitute overcollateralization release amount and be distributed as excess cashflow.

42. This issue with the Pay First Method can be illustrated through the following hypothetical. Assume an OC Trust has $100 million in aggregate mortgage loan balances and the Class A, Class M, and Class B certificates have $100 million in aggregate certificate principal balances, *i.e.*, there currently is no overcollateralization amount. Also, assume the overcollateralization target is $10 million, and the Settlement Payment for the OC Trust is $20 million. For purposes of calculating the overcollateralization amount using the Pay First Method, the applicable aggregate certificate principal balances would be treated as if decreased by $20 million to $80 million to account for the incoming Settlement Payment and the aggregate mortgage loan balances would remain at $100 million. The OC Trust would thus appear to have $20 million (the amount of the Settlement Payment) in overcollateralization amount and $10 million in overcollateralization release amount (the overcollateralization amount ($20 million) less the overcollateralization target amount ($10 million)). The $10 million in overcollateralization release amount would be distributed as excess cashflow, which may be applied to pay interest shortfalls or reimburse previously-recognized realized losses and not a principal distribution amount. However, if the Write-Up First Method were used, the aggregate certificate principal balances would first be written up to $120 million. Again, for the purposes of calculating overcollateralization amount, the applicable aggregate certificate principal balances would be decreased by $20 million to $100 million to account for the application of the Settlement Payment. However, unlike the Pay First Method, there would be no overcollateralization amount because the aggregate mortgage loan balances ($100 million) would equal the aggregate certificate principal balances ($100 million). The entire $20 million

Settlement Payment would thus be distributed as principal amount and there would be no excess cashflow distribution.

43. Importantly, the distribution of excess cashflow is performed under its own waterfall separate and apart from the waterfall applicable to principal distribution amounts. Under this separate provision, excess cashflow may be distributed to Class A certificates to pay any interest shortfalls and then is distributed to Class A certificates to reimburse previously recognized realized loss amounts. Excess cashflow thereafter is distributed to pay certain other interest shortfalls, basis risk shortfalls, and other similar types of items. Any remaining excess cashflow is typically distributed to the Class X certificates (and if there is any excess cashflow still remaining thereafter, to residual certificates[17]).

44. For the OC Trusts with an undercollateralization feature, a mirror image of the same issue exists. For these OC Trusts, the senior certificates of a group are an "Undercollateralized Group" on a distribution date if the certificate principal amount of those senior certificates exceeds the principal balance of the group's mortgage loans. Undercollateralized Groups are entitled to an "Undercollateralization Distribution" which essentially shifts amounts that would otherwise be payable to subordinate certificates to the Undercollateralized Group of senior certificates.[18] For these OC Trusts, a write-up first order of operations could cause the senior certificates in a group to appear to be undercollateralized.

---

[17] The Settlement Agreements prohibit distributions of the Settlement Payments to residual certificates. *See* Covered Loan Settlement Agreement, § 3.06(a) ("If distribution of Plan Payments to a trust would become payable to a class of REMIC residual interests, whether on the initial distribution of such Plan Payments or on any subsequent distribution date that is not the final distribution date under the Governing Agreement for such Trust, such Plan Payment shall be maintained in the distribution account, and the party responsible for distributing payments under the Governing Agreements of a given trust shall distribute it on the next distribution date according to the provisions of this Subsection 3.06(a).").

[18] *See*, SARM 2005-22 Trust Agreement, § 1.01, Definition of Undercollateralized Group, Undercollateralized Distribution, and §5.02(f)(ii)(A).

45. The distribution of any portion of the Settlement Payments for an OC Trust through the excess cashflow waterfall instead of the principal amount waterfall could have significant impacts on the resulting distribution of funds constituting the Settlement Payment for the OC Trust.

46. First, the distribution of the Settlement Payment to OC Trusts with multiple classes of Class A certificates could be impacted. Distributions to Class A certificates under the principal amount waterfall can differ from distributions to Class A certificates under the excess cashflow waterfall.

47. Second, the distribution of the Settlement Payment for OC Trusts could be impacted where the excess cashflow distribution is greater than aggregate unpaid realized losses of the Class A certificates. Excess cashflow distributions to reimburse unpaid realized losses to Class A certificates cannot exceed the aggregate outstanding amount of such losses. As a result, if unpaid realized losses of the Class A certificates are particularly small and the excess cashflow distribution large, there is a potential that some portion, and even perhaps a large portion, of the Settlement Payments for an OC Trust could be distributed to the Class X certificates.

48. Third, distribution of the Settlement Payment for the OC Trusts with undercollateralization provisions could cause amounts that would otherwise be payable to subordinate certificates to be distributed to the senior certificates instead.

**(ii) Potential For Differing Distributions Of Principal Amount**

49. The distribution of the Settlement Payments as principal amount, in part or in whole, may also be impacted depending on whether the Petitioners use the Pay First Method or the Write-Up First Method.

50. The certificate principal balance of a Class A (or Class M or Class B) certificate represents the maximum amount—or ceiling—of principal amount that such certificate is entitled to receive. The certificate principal balance therefore represents a ceiling on the amount of the Settlement Payments that the certificates can receive in the form of principal amount. If the Pay First Method were used, this ceiling would always be lower than if the Write-Up First method were used, because the certificate principal balance would not be increased by the Settlement Payment Write-Up until after distribution of the Settlement Payments. That may result in a diminished recovery from the Settlement Payments for some Certificateholders.

51. This can be illustrated through the following hypothetical. Assume a Subject Settlement Trust has Class A-1 certificates with $5 million in aggregate outstanding certificate principal balances and $5 million in realized losses and Class A-2 certificates with $2 million in aggregate outstanding certificate principal balances and $8 million in realized losses. Assume also that the Settlement Payment for the Subject Settlement Trust is $6 million and, for the purposes of this hypothetical, that the Settlement Payment would be distributed entirely as principal amount (and no portion thereof would be distributed as excess cashflow). Principal amount is distributed sequentially first to Class A-1 and second to Class A-2, and any write-ups would be applied first to Class A-1 and then second to Class A-2. If the Pay First Method is used, $5 million would be distributed to the Class A-1 certificates, resulting in remaining Class A-1 certificate principal balance of zero, and the remaining $1 million would be distributed to the Class A-2 certificates, resulting in a remaining Class A-2 certificate principal balance of $1 million. Thereafter, the Settlement Payment Write-Up would be applied, and the aggregate certificate principal balances of the Class A-1 certificates would be restored to $5 million (applying the Settlement Payment Write-Up up to the amount of the $5 million in realized losses

on such class) and the aggregate certificate principal balances of the Class A-2 certificates would be restored to $2 million (applying the remaining Settlement Payment Write-Up to such class). If the Write-Up First Method is used, first the aggregate certificate principal balances of the Class A-1 certificates would be increased by $5 million (applying the Settlement Payment Write-Up up to the amount of the $5 million in realized losses on such class) to $10 million and the aggregate certificate principal balances of the Class A-2 certificates would be increased by $1 million (applying the remaining Settlement Payment Write-Up to such class) to $3 million. The entire $6 million Settlement Payment would then be distributed to the Class A-1 certificates and the aggregate certificate principal balance of the Class A-1 Certificates would then be reduced to $4 million. The Class A-2 certificates, however, would receive no amount of the Settlement Payment and the aggregate outstanding Class A-2 certificate principal balance would remain at $3 million.

**(iii) Potential For Portions Of The Settlement Payment To Be Without Any Clear Method For Distribution**

52. If the Pay First Method were used, it would be unclear how to distribute any portion of the Settlement Payment for a particular Subject Settlement Trust that exceeds the then-outstanding aggregate certificate principal balances of the classes of certificates of such Subject Settlement Trust.

53. In this scenario, the Settlement Payments could only be distributed as principal amount up to the amount of the then-outstanding aggregate certificate principal balances, as previously explained, and any portion of the Settlement Payments that exceeds such balances would remain. It appears that there could be many different approaches to distribute this remaining amount. For example, it could potentially be distributed as excess cashflow, though it is not clear under the Governing Agreements that it should be distributed as such. Or, it could be

held over until the next distribution period and distributed following the application of at least some portion of the Settlement Payment Write-Up. But, it is likewise unclear whether such a holdover would be permissible under the Governing Agreements.

54. If the Write-Up First Method were used, this issue would not arise. Because the Settlement Payment Write-Up would be applied prior to determining the distribution of the Settlement Payments, the Settlement Payments for a particular Subject Settlement Trust would necessarily be less than or equal to the newly written-up aggregate certificate principal balances.

**THE ORDER OF THE DISTRIBUTION OF THE SETTLEMENT PAYMENT AND THE WRITE-UP OF CERTIFICATE PRINCIPAL BALANCES**

55. Petitioners have also identified a number of issues related to classes of certificates or loan groups with current aggregate certificate principal balances of zero.

56. First, for certain of the Subject Settlement Trusts, the applicable Governing Agreements contain a provision substantially similar to the following:

> If on any Distribution Date the Class Principal Amount of the Class or Classes of Non-AP Senior Certificates related to any Mortgage Pool have been reduced to zero, the Senior Principal Distribution Amount for such Class or Classes of Non-AP Senior Certificates for such date (following such reduction) and each subsequent Distribution Date *shall be zero.*

*See, e.g.*, SASC 2004-12H, §1.01 (definition of Senior Principal Distribution Amount) (emphasis added). This is referred to for reference herein as the "Zero Distribution Provision."

57. The Zero Distribution Provision appears to preclude any further distributions to any Class or Classes of "Non-AP Senior Certificates" (or similarly designated certificates) if the aggregate certificate principal balance of such class has been reduced to zero ("Zero Balance Classes"), no matter whether the Zero Balance Classes have been reduced to zero as a result of

adopted the positions taken by the appearing certificateholders, have yielded conflicting results in some respects and have shown that investors hold different views on contractual distribution provisions that are in some ways similar those contained in the Governing Agreements at issue here.[19]

63. In light of the evident uncertainty surrounding the resolution of the issues identified in this Petition and the potential for disagreements among Certificateholders and other interested parties, judicial instructions are necessary to clarify the Petitioners' contractual obligations in this regard and to facilitate the ultimate administration and distribution of the Settlement Payment in a final and binding manner. Absent instructions, there is a significant risk of challenges to the Settlement Payment Application Process following receipt of the Settlement Payments by Certificateholders and other interested parties. This could result in divergent rulings across multiple jurisdictions and create uncertainty surrounding whether the Settlement Payments could ultimately be clawed-back or otherwise subject to disputed claims. A single Article 77 proceeding in this Court is the most appropriate forum to facilitate and provide a resolution.[20] It will permit all interested parties to appear and be heard in an orderly and efficient process, and will result in a uniform, final judgment.

---

[19] *Compare In the matter of Loan Group I of the Bear Stearns Mortgage Funding Trust 2007-SL1 and Bear Stearns Asset Backed Securities I Trust 2007-AQ2*, Court File No. 27-TR-CV-17-29 (Minn. Dist. Court, Hennepin County), Order (Sept. 26, 2017) (instructing and authorizing trustee to "apply the 'write-up first method'" for the applicable settlement payment, pursuant to the corresponding settlement agreement and governing agreements), *and In the matter of Loan Group I of the Bear Stearns Mortgage Funding Trust 2007-SL1 and Bear Stearns Asset Backed Securities I Trust 2007-AQ2*, Court File No. 27-TR-CV-17-29 (Minn. Dist. Court, Hennepin County), Order (Sept. 11, 2017) (same), *and In the matter of the trusteeship created by Bear Stearns Asset Backed Securities I LLC relating to the issuance of certificates by SACO I Trust 2006-7 pursuant to a Pooling and Servicing Agreement dated as of June 1, 2006*, Court File No. 27-TR-CV-15-309 (Minn. Dist. Court, Hennepin County), Order (May 30, 2017) (instructing trustee "to withdraw the Settlement Payment from the [a]ccount and apply the Settlement Payment in accordance with the 'write up first, pay second' method"), *with In re Bank of New York Mellon*, Index No. 150973/2016 (N.Y. Sup. Court), Decision (April 4, 2017) (applicable settlement agreement "directed the Trustee to pay out the Allocable Share first, and then to write up the certificates in the amount of the Allocable Share") (Notice of Appeal filed October 25, 2017).

[20] *See* CPLR 7701 (an Article 77 "special proceeding may be brought to determine a matter relating to any express trust . . ."); *BlackRock Fin. Mgmt. Inc.*, et al. *v. Segregated Account of Ambac Assurance Corporation*, et al., 673

## NEED FOR ESCROW ARRANGEMENTS PENDING FINAL DETERMINATION

64. The Covered Loan Settlement Agreement provides that:

> To the extent that any Accepting Trustee is the party responsible for distributing payments for a given Trust under the applicable Governing Agreement(s), that Accepting Trustee shall use its reasonable best efforts to distribute the amounts received from the LBHI Debtors on account of the Allocable Shares of the Net Allowed Claim promptly.

Settlement Agreement, § 3.01 (emphasis added).

65. Each Petitioner charged with distributing the Settlement Payments for each of the Settlement Trusts, expects to enter into separate "escrow agreements" substantially in the forms attached as Exhibit 1 to the Affidavit of Robert L. Schnell, Jr. filed contemporaneously herewith (the "Schnell Affidavit") (each, an "Escrow Agreement," and together, the "Escrow Agreements"). Each Petitioner, solely in its individual, non-trustee capacity unrelated to any of the Settlement Trusts, is designated as the "Escrow Agent" under the Escrow Agreement applicable to the Settlement Trusts for which such Petitioner is trustee, indenture trustee, successor trustee, paying agent, or securities administrator. The Accepting Trustees have provided the account information for the escrows to the LBHI Debtors. The next scheduled distribution date of the LBHI Debtors' estate is scheduled for April 5, 2018.

66. This proceeding's purpose—to obtain the Court's guidance on the Settlement Payment Application Process—would be frustrated if the Settlement Payments for the Subject Settlement Trusts were immediately routed from escrow to the Settlement Trusts and distributed to Certificateholders without this Court's direction. Immediate distribution using any of the various approaches to the Settlement Payment Application Process discussed above would

---

F.3d 169, 174 (2012) ("Permissible uses of Article 77 are broadly construed to cover any matter of interest to trustees, beneficiaries or adverse claimants concerning the trust . . . . Such proceedings are used by trustees to obtain instruction as to whether a future course of conduct is proper, and . . . to obtain interpretations of the meaning of trust documents.") (citations omitted).

irreversibly alter the status quo, as it would be impracticable for the Petitioners to claw-back and redistribute the Settlement Payments (which, over time, are likely to exceed $1 billion) from the Certificateholders of the Settlement Trusts in the face of a contrary judicial instruction.

67. Therefore, to maintain the status quo, the Petitioners request that the Court immediately order each Petitioner, through the applicable Escrow Agent, to maintain the Allocable Shares of the Settlement Payments for the applicable Subject Settlement Trusts as a deposit in escrow pursuant to such Petitioner's Escrow Agreement until such time as the Court enters an order concerning the Settlement Payment Application Process and directing the transfer of the Settlement Payments to the applicable collection accounts or distribution accounts for the related Settlement Trusts. It is necessary for the Settlement Payments for the Subject Settlement Trusts to be held outside of the collection accounts and distribution accounts because under the Governing Agreements and Settlement Agreements, any funds deposited in such accounts must generally be distributed to Certificateholders in a matter of days or weeks.

68. The Escrow Agreements contemplate that the Settlement Payments cannot be invested unless and until a direction is provided by this Court concerning such investment. Consistent therewith, the Petitioners request that the Court direct each of the Escrow Agents to use commercially reasonable efforts to cause the Settlement Payments for the Subject Settlement Trusts to be invested and reinvested in the high quality money market funds described in the proposed Order filed contemporaneously herewith (for each Escrow Agent, the "Approved Funds"). The Approved Funds are among the highest rated money market funds. The liquidity of these money market funds will facilitate the ability of the Petitioners to make an interim or final distribution to Certificateholders during the pendency of this proceeding subject to further orders of this Court.

69. The Governing Agreements of many of the Subject Settlement Trusts provide that earnings derived from the investment of any amount received by a Subject Settlement Trust on the mortgage loans are payable as additional compensation to the servicer, the securities administrator, or another administrator of the Subject Settlement Trust rather than to the Certificateholders. These provisions were intended to apply to relatively small amounts that were invested for a matter of days or weeks pending the next monthly distribution date. The investment earnings on the Settlement Payments, which might be invested for a much longer period, are likely to be significantly higher than the earnings on the temporary investment of proceeds from the mortgage loans.

70. The Petitioners request that this Court direct that any interest earned on the investments held in escrow be re-invested and inure to the benefit of Certificateholders. Further, in order for the Petitioners to be able to write-up the certificate principal balance of the certificates appropriately, the investment earnings accruing on the escrowed funds will be included in each Settlement Trust's Allocable Share under the Settlement Agreements and treated as subsequent recoveries received on the mortgage loans. The Petitioners request that the Court direct that, upon a final determination of this Court concerning the Settlement Payment Application Process, the full amount released from escrow to a Subject Settlement Trust be treated as that Subject Settlement Trust's Allocable Shares under the Settlement Agreements. With respect to each Petitioner, the Escrow Agreements provide a mechanism to allocate earnings proportionally among the Subject Settlement Trusts. The Escrow Agents will not receive any fees, interest or other monetary benefit under the Escrow Agreements and neither will the Petitioners, servicers, securities administrators, or other administrators of the Settlement Trusts.

71. In addition to the foregoing, future direction by the Court may be necessary concerning the Escrow Agreements in certain circumstances.

72. For federal income tax purposes, many of the Subject Settlement Trusts are comprised of one or more "real estate mortgage investment conduits" ("REMICs"), as defined in Section 860D of the Internal Revenue Code (the "IRC") (each such Subject Settlement Trust, a "REMIC Trust"). REMICs must meet certain criteria to maintain their status as REMICs, including a requirement that no more than a *de minimis* amount of a REMIC's assets consist of assets other than qualified mortgages and "permitted investments." IRC § 860D(a)(4); 26 CFR § 1.860D-1(b)(3). Permitted investments include only certain assets, including "cash flow investments." IRC § 860G(a)(5). Cash flow investments are defined as "any investment of amounts received under qualified mortgages for a temporary period before distribution to holders of interests in the REMIC." IRC § 860G(a)(6). The regulations implementing the REMIC provisions state that a "temporary period may not exceed 13 months." 26 CFR § 1.860G-2(g)(1)(iii).

73. Each REMIC Trust received a ruling from the Internal Revenue Service that the REMIC Trust's Allocable Share is to be treated for tax purposes as amounts received on qualified mortgages held by the REMIC Trusts. As a result, if the Settlement Payments are held in escrow undistributed for longer than thirteen months, it could arguably jeopardize the REMIC Trusts' statuses as qualified REMICs.

74. Out of an abundance of caution, if it appears that the Settlement Payments for any of the REMIC Trusts may be held for a period longer than thirteen months, the Petitioners anticipate seeking further guidance from this Court with respect to such REMIC Trusts. The Petitioners expect that they will request direction from the Court that requires the Settlement

Payments for such REMIC Trusts to be treated as distributed to Certificateholders solely for federal, state, and local income tax purposes. This type of a direction would permit the applicable Settlement Payments to be held undistributed for a further period of time without implicating potential REMIC issues.

## REQUEST FOR RELIEF

**WHEREFORE**, pursuant to the provisions of CPLR Art. 77 and all other applicable law, the Petitioners respectfully request that this Court:

1. Conclude that it has exclusive jurisdiction over the subject matter of this Article 77 proceeding, all parties to this proceeding, the Petitioners, and all certificateholders, noteholders, and other parties claiming rights in the Subject Settlement Trusts, for the purposes of rendering such additional instructions as are necessary and/or appropriate in the administration of the Subject Settlement Trusts and, further, retain jurisdiction to enforce the terms of its judgment;
2. Direct, as an interim measure necessary to permit the Court to direct the Petitioners on the administration and distribution of the Allocable Shares for each Settlement Trust, each Trustee to maintain, through the Escrow Agent, the applicable Allocable Shares of all Subject Settlement Trusts as a deposit in escrow pursuant to the Escrow Agreements substantially in the forms attached as Exhibit 1 to the Schnell Affidavit until such time as the Court enters an order directing the transfer of the Allocable Shares to the applicable collection accounts or distribution accounts for the related Settlement Trusts;
3. Direct each of the Escrow Agents to use commercially reasonable efforts to keep the Allocable Shares invested and reinvested in the high quality money market funds described in Exhibit 2 to the Schnell Affidavit;

realized losses or because they have been paid in full as to their initial certificate principal balance.

58. The Zero Distribution Provision could arguably prevent Zero Balance Classes from receiving any distribution of the Settlement Payments or any application of the Settlement Payment Write-Up, but it is not clear whether or how such provision should apply in this circumstance.

59. Exhibit G hereto contains a list of all Subject Settlement Trusts potentially impacted by a Zero Distribution Provision.

**NEED FOR JUDICIAL INSTRUCTION**

60. As demonstrated above, there are significant issues concerning the Settlement Payment Application Process, and it is unclear how those issues should be resolved under the terms of the Governing Agreements.

61. The resolution of these issues may ultimately have an impact on which Certificateholders receive and the corresponding amount of any principal distribution attributable to the Settlement Payments. There may also be an impact on which certificates are written up and the amount of any write-ups applied to certificates in connection with the Settlement Payment Write-Up. Certificateholders and other interested parties—the direct economic beneficiaries of the Settlement Payments—may have competing views concerning how the issues should be resolved, depending on the particular classes of certificates that they hold and how those classes may be impacted.

62. There have also been other recent judicial instruction proceedings concerning issues similar to those identified in this Petition in the context of settlement payments for residential mortgage-backed securitization settlements. Those proceedings, which sometimes

balances of the Class A, Class M, and Class B certificates. For many of the OC Trusts, the overcollateralization target has not been met or exceeded for many years and, as a result, there have been no recent overcollateralization release amounts and no excess cashflow distributions.

41. However, the Pay First Method may cause the OC Trusts to appear to be temporarily overcollateralized. As explained, the overcollateralization amount for a given distribution date is calculated as the excess of the aggregate mortgage loan balances over the pertinent aggregate certificate principal balances. The applicable Governing Agreements provide that in determining the amount of the aggregate certificate principal balances for this calculation, it should be assumed that all of the applicable period's principal funds are being applied as principal amount to reduce such balances.[16] The Settlement Payment is treated as though it is a subsequent recovery included in any principal funds and, as a result, the aggregate certificate principal balances are therefore reduced by the amount of the Settlement Payment. Applying the Pay First Method to the OC Trusts would make it appear that the overcollateralization amount includes the entire amount of the Settlement Payment, to the extent that the unchanged aggregate mortgage loan balances would exceed the adjusted aggregate certificate principal balances as reduced by amount of the Settlement Payment. Therefore, any portion of the Settlement Payment (*i.e.*, overcollateralization amount) in excess of the

[16] *See, e.g.*, SASCO 2005-GEL2 PSA, § 1.01, Definition of Overcollateralization Amount ("With respect to any Distribution Date, the amount, if any, by which (x) the Pool Balance for such Distribution Date exceeds (y) the aggregate Class Principal Amount of the Offered Certificates *after giving effect to distributions on such Distribution Date.*") (emphasis added), Definition of Aggregate Overcollateralization Release Amount ("With respect to any Distribution Date, the lesser of (x) the Principal Remittance Amount for such Distribution Date and (y) the amount, if any, by which (i) the Overcollateralization Amount for such date, *calculated for this purpose on the basis of the assumption that 100% of the Principal Remittance Amount for such Distribution Date is applied on such date in reduction of the aggregate Certificate Principal Amount of the Offered Certificates*, exceeds (ii) the Targeted Overcollateralization Amount for such Distribution Date.") (Emphasis added); LXS 2005-2 PSA, § 1.01, Definition of Pool 1 Overcollateralization Amount (similar); Definition of Pool 1 Overcollateralization Release Amount (similar).

4. Hold that the Petitioners and Escrow Agents are entitled to exculpation from liability for placing, receiving, holding, investing, and/or reinvesting the Allocable Shares for the Settlement Trusts in escrow in accordance with the Court's direction;

5. At such designated time and place, make and enter an order instructing and authorizing the Petitioners to (the "Settlement Payment Instruction"):

   a. with respect to the Subject Settlement Trusts listed on Exhibit A hereto, administer and distribute the applicable Allocable Shares using the Pay First Method, the Write-Up First Method, or a different method authorized by this Court (and if the Pay First Method or Write-Up First Method is used, apply adjustments as may be necessary at the time of the distribution of the Allocable Shares, if and to the extent so ordered, to account for OC issues, issues related to classes of certificates or loan groups that have an aggregate certificate principal balance of zero and issues related to Settlement Trusts in which aggregate certificate principal balances of the outstanding classes are currently less than the applicable Allocable Shares);

   b. comply with any other instruction from this Court concerning the distribution or administration of the Allocable Shares;

   c. with respect to the Subject Settlement Trusts listed on Exhibit G hereto, (x) administer and distribute the pertinent Allocable Shares, including any applicable increases to certificate principal balances, without applying or giving any effect whatsoever to the Zero Distribution Provision; (y) apply the Zero Distribution Provision to prevent distribution of the applicable Allocable Shares to any applicable classes of certificates with aggregate certificate principal balances of

zero at the time of the distribution of the Allocable Shares and to prevent any portion of the Settlement Payment Write-Up from being applied to any such classes of certificates; or (z) use a different method authorized by this Court to address the Zero Distribution Provision; and

d. comply with any other instruction from this Court concerning the distribution or administration of the Allocable Shares.

6. Instruct, authorize, and order the Petitioners and any other party responsible for administering payments with respect to the Subject Settlement Trusts to administer and distribute the Allocable Shares for the Subject Settlement Trusts in accordance with the Settlement Payment Instructions as promptly as reasonably possible taking into account the working time necessary to administer and distribute the Allocable Shares and any adjustments required to effectuate the Settlement Payment Instructions for any Settlement Trust, including verification and testing to the extent necessary;

7. Order that certificateholders, noteholders, and any other parties claiming rights in the Settlement Trusts are barred from asserting claims against any Petitioner with respect to such Petitioner's administration and distribution of the Settlement Payments, so long as such administration and distribution is consistent with the Settlement Payment Instructions and any other orders of the Court; and

8. Grant any other, additional, and different relief this Court deems just and proper.

HAHN & HESSEN LLP

______________________
Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

______________________
Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank, National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

______________________
Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

______________________
Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust, National Association and Wilmington Trust Company*

MORGAN, LEWIS & BOCKIUS LLP

______________________
Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National Association*

HAHN & HESSEN LLP

________________________

Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

________________________

Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank, National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

________________________

Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

[signature]

Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust, National Association and Wilmington Trust Company*

MORGAN, LEWIS & BOCKIUS LLP

________________________

Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National Association*

HAHN & HESSEN LLP

Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank, National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust, National Association and Wilmington Trust Company*

MORGAN, LEWIS & BOCKIUS LLP

Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National Association*

HAHN & HESSEN LLP

______________________________
Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

______________________________
Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank, National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

______________________________
Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

______________________________
Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust, National Association and Wilmington Trust Company*

MORGAN, LEWIS & BOCKIUS LLP

______________________________
Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National Association*

HAHN & HESSEN LLP

______________________

Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

______________________

Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank, National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

______________________

Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

______________________

Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust, National Association and Wilmington Trust Company*

MORGAN, LEWIS & BOCKIUS LLP

______________________

Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National Association*

EXHIBIT 2.

No. 1598459

## Certification

STATE OF NEW YORK, COUNTY OF NEW YORK, SS:

I, Milton Adair Tingling, County Clerk and Clerk of Supreme Court New York County, do hereby certify that on September 23, 2024 I have compared the document attached hereto,

JUDGMENT page(s) 23

with the originals filed in my office and the same is a correct transcript therefrom and of the whole of such original in witness whereto I have affixed my signature and seal.

MILTON ADAIR TINGLING
NEW YORK COUNTY CLERK

At IAS Part 60 of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York, New York on the 9th day of July 2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the application of<br><br>U.S. BANK NATIONAL ASSOCIATION, WELLS FARGO BANK, NATIONAL ASSOCIATION, WILMINGTON TRUST, NATIONAL ASSOCIATION, WILMINGTON TRUST COMPANY, and CITIBANK, N.A. (as Trustees, Indenture Trustees, Securities Administrators, Paying Agents, and/or Calculation Agents of Certain Residential Mortgage-Backed Securitization Trusts),<br><br>Petitioners,<br><br>For Judicial Instructions under CPLR Article 77 on the Administration and Distribution of a Settlement Payment. | Index No. 651625/2018<br><br>Friedman, J.<br><br>CONSENT [~~PROPOSED~~] PARTIAL SEVERANCE ORDER AND PARTIAL FINAL JUDGMENT |

WHEREAS, the Petitioners identified in the above case caption commenced this proceeding under CPLR Article 77 by filing a petition (the "Petition") seeking judicial instructions concerning the administration and distribution of settlement payments (the "Settlement Payments") for 208 residential mortgage-backed securities trusts identified in Exhibit A to the Petition (the "Subject Settlement Trusts") under a Covered Loan Settlement Agreement dated as of November 30, 2016 and modified as of March 17, 2017 and a Transferor Loan Settlement Agreement dated September 5, 2017 and executed and accepted on October 13, 2017 (together with the Covered Loan Settlement Agreement, the "Settlement Agreements"); and

WHEREAS, all capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Petition; and

AF

WHEREAS, pursuant to the Settlement Agreements, the Settlement Payments are to be apportioned among the Subject Settlement Trusts; and

WHEREAS, by Order dated May 30, 2018 (the "Escrow Order"), the Court authorized and directed the Petitioners to place the Settlement Payments for the Subject Settlement Trusts in escrow; and

WHEREAS, the Petitioners represent that they have complied with the escrow provisions of the Escrow Order and that the Settlement Payments for the Subject Settlement Trusts, plus any investment earnings thereon, are currently invested as directed in the Escrow Order; and

WHEREAS, under the Order to Show Cause dated April 18, 2018 (the "Show Cause Order"), the Court directed the Petitioners to provide notice of this proceeding pursuant to the notice program described in the Show Cause Order (the "Notice Program"), and the Court found that the Notice Program was the best notice practicable, was reasonably calculated to put interested persons on notice of the proceeding, and constituted due and sufficient notice of the proceeding in satisfaction of federal and state due process requirements and other applicable law; and

WHEREAS, the Notice Program directed that interested persons respond to the Petition on or before May 30, 2018; and

WHEREAS, the Institutional Investors, the AIG Parties (American General Life Insurance Company, American Home Assurance Company, American International Reinsurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, The United States Life Insurance Company, and the Variable Annuity Life Insurance Company), Poetic Holdings VII LLC, Nover Ventures, LLC, Ambac Assurance Corporation, and the Olifant Funds (Olifant Fund, Ltd., FFI Fund Ltd., and FYI Ltd.) (collectively, the

"Responding Parties") have asserted an interest in the Subject Settlement Trusts identified in Exhibit A hereto (the "Undisputed Trusts"); and

WHEREAS, the Responding Parties agree and consent to this Partial Severance Order and Partial Final Judgment (this "Order"), which resolves the issues for which judicial instructions were sought concerning the administration and distribution of the Settlement Payments for the Undisputed Trusts (the "Subject Allocable Shares"); and

WHEREAS, as identified in Exhibit A hereto, U.S. Bank National Association ("U.S. Bank"), Wilmington Trust National Association, Wilmington Trust Company, and Wells Fargo Bank, National Association ("Wells Fargo") are the trustees, successor trustees, and/or indenture trustees for the Undisputed Trusts (in such capacities, the "Subject Trustees") and U.S. Bank, Wells Fargo, and Citibank, N.A. are the securities administrators, paying agents, and/or calculation agents for the Undisputed Trusts (in such capacities, the "Subject Payment Administrators"); and

WHEREAS, as used herein, the term "Judgment Entry Date" means the date on which the Clerk's docketing of this Order first appears publicly on the New York State Court Electronic Filing System, without regard to when the Court actually signs or the Clerk actually enters this Order; and

WHEREAS, as used herein the term "Transfer Month" means the second calendar month after the Judgment Entry Date; and

WHEREAS, as used herein, the term "AS Distribution Date" means the Distribution Date (as that term is defined in the applicable Governing Agreements) for each of the Undisputed Trusts occurring in the Transfer Month; and

WHEREAS, as used herein, the term "Transfer Target Date" means ten days prior to the AS Distribution Date (or, if occurring on a day that is not a business day, the immediately preceding business day); and

WHEREAS, for each Undisputed Trust included in Exhibit B hereto, the term "Overcollateralization Amount Calculation" is used herein to refer to the terms in the applicable Governing Agreements prescribing that the "overcollateralization amount" is equal to the excess of the aggregate balances of the mortgage loans held by the Undisputed Trust over the aggregate certificate principal balances of certain designated classes of certificates and the term "Undercollateralization Amount Calculation" is used herein to refer to the terms in the applicable Governing Agreements prescribing that the "undercollateralization amount" is equal to the excess of the aggregate certificate principal balances of certain designated classes of certificates over the aggregate balances of the mortgage loans held by the Undisputed Trust, in each case as more fully defined and described in the applicable Governing Agreements; and

NOW, THEREFORE, on the motion of the Petitioners and the Responding Parties, it is hereby

ORDERED, ADJUDGED and DECREED that, on or before the Transfer Target Date, the Subject Trustees (each with respect to the Undisputed Trusts for which each act as trustee) are to (i) cause escrowed assets to be liquidated to cash with a value equal to the Settlement Payment for each Undisputed Trust (the "Subject Allocable Shares") plus any investments earnings thereon, and (ii) cause the Subject Allocable Shares and investment earnings thereon to be deposited in the respective distribution accounts of the Undisputed Trusts. From the time of the aforedescribed deposit, the amount so deposited shall be deemed the Subject Allocable Shares for the Undisputed Trusts for all purposes under the Settlement Agreements and this Order; and it is further

ORDERED, ADJUDGED and DECREED that sums representing investment earnings accrued on the Subject Allocable Shares not received at the time escrowed assets are liquidated to cash pursuant to the immediately preceding paragraph ("Trailing Interest") shall (i) for Undisputed Trusts where the Subject Trustee and Subject Payment Administrator are the same party, be distributed on the later of the AS Distribution Date or the Distribution Date for the month following the month such Trailing Interest is received by the Subject Trustee or (ii) for Undisputed Trusts where the Subject Trustee and Subject Payment Administrator are different parties, be distributed on the later of the AS Distribution Date or the Distribution Date for the month following the month such Trailing Interest is transferred from the Subject Trustee to the Subject Payment Administrator (which transfer shall take place within five days after the Subject Trustee receives such Trailing Interest). Any Trailing Interest shall be deemed a Subject Allocable Share for the Undisputed Trust on whose Allocable Share such Trailing Interest was accrued, and any Trailing Interest shall be administered and distributed as a Subject Allocable Share subject to the terms of the Settlement Agreements and this Order; and

ORDERED, ADJUDGED and DECREED that the Subject Payment Administrators shall distribute the Subject Allocable Shares to certificateholders of the Undisputed Trusts on the AS Distribution Date; and it is further

ORDERED, ADJUDGED and DECREED that in administrating and distributing the Subject Allocable Shares for each Undisputed Trust identified in Exhibit B, the Subject Payment Administrators (i) shall first distribute the Subject Allocable Shares to certificateholders based on certificate principal balances that have not been adjusted by the Settlement Payment Write-Up, and, after such distribution, (ii) shall then increase the applicable certificate principal balances in

the amount of the Settlement Payment Write-Up in a manner consistent with this Order; and it is further

ORDERED, ADJUDGED and DECREED that in administering and distributing the Subject Allocable Share for LXS 2006-3, the applicable Subject Payment Administrator shall increase the applicable certificate principal balances by the amount of the Settlement Payment Write-Up based on Deferred Amounts as of the Distribution Date immediately preceding the AS Distribution Date when the applicable Trust Agreement specifies a pro rata write-up of certificate balances; and it is further

ORDERED, ADJUDGED and DECREED that in administering and distributing the Subject Allocable Shares for each Undisputed Trust identified in Exhibit B hereto, the Subject Payment Administrators shall ignore both the distribution of the Subject Allocable Shares and the accompanying Settlement Payment Write-Up when performing the Overcollateralization Amount Calculation or the Undercollateralization Amount Calculation and, further, for the avoidance of doubt, with respect to the Distribution Date on which the Subject Allocable Shares are distributed, the instructions in this paragraph are intended to and shall prevent the Undisputed Trusts identified in Exhibit B hereto from being overcollateralized or undercollateralized solely as a result of the receipt, administration, and/or distribution of the Subject Allocable Shares (but shall not impact whether the Undisputed Trusts in Exhibit B are overcollateralized or undercollateralized on such Distribution Date as result of anything unrelated to the receipt, administration, and or distribution of the Subject Allocable Shares); and it is further

ORDERED, ADJUDGED and DECREED that in administering and distributing the Subject Allocable Shares for each Undisputed Trust included in Exhibit B hereto that contains a Zero Distribution Provision, the applicable Subject Payment Administrator shall (i) apply any Zero

Distribution Provision to prevent the distribution of the Subject Allocable Shares to any applicable class of certificates with aggregate certificate principal balances of zero dollars ($0.00) ("Retired Classes") at the time of the distribution of the Subject Allocable Shares and (ii) apply any Zero Distribution Provision to permit the Settlement Payment Write-Up to be applied only to classes of certificates with aggregate certificate principal balances greater than zero dollars ($0.00) at the time of the distribution of the Subject Allocable Shares (the "Outstanding Classes"); *provided, however*, that if the Settlement Payment Write-Up exceeds the aggregate unpaid realized losses of all Outstanding Classes of an Undisputed Settlement Trust or of an individual loan group of an Undisputed Settlement Trust with multiple loan groups therein, such excess amount of the Settlement Payment Write-Up shall be applied to Retired Classes in such Undisputed Trust or loan group in a manner consistent with this Order; and it is further

ORDERED, ADJUDGED and DECREED that in administering and distributing the Subject Allocable Shares for each Undisputed Trust included in Exhibits C and D hereto, the applicable Subject Payment Administrator shall increase the certificate principal balances of the applicable classes of certificates in the amount of the Settlement Payment Write-Up using the write-up instructions in the applicable Governing Agreement and thereafter distribute the Subject Allocable Shares to certificateholders based on certificate principal balances that have been adjusted by the Settlement Payment Write-Up; and it is further

ORDERED, ADJUDGED and DECREED that in administering and distributing the Subject Allocable Shares for each Undisputed Trust included in Exhibit D hereto, the applicable Subject Payment Administrator shall not apply the Zero Distribution Provision to prevent the write up of, or distribution of the Subject Allocable Shares to, any Retired Class; and it is further

ORDERED, ADJUDGED and DECREED that any aspects of the administration and distribution of the Subject Allocable Shares not expressly addressed in this Order shall be performed as provided for in the Governing Agreements and the Settlement Agreement; and it is further

ORDERED, ADJUDGED and DECREED that this Order is not applicable to, and shall be without prejudice to and shall have no precedential effect on, (i) any argument of any party concerning the appropriate administration and distribution of the Settlement Payments where there is a dispute among the parties regarding how the Settlement Payments should be administered and distributed; (ii) the Subject Settlement Trusts for which no parties have appeared in this proceeding or any trust, indenture, or other securitization other than the Undisputed Trusts, or (iii) any applications to certificate balances *(e.g.,* write-ups) or distributions of payments or funds other than the Subject Allocable Shares; and it is further

ORDERED, ADJUDGED and DECREED that this Order shall not preclude any argument of any party concerning whether the Petition should be dismissed with respect to the Subject Settlement Trusts other than the Undisputed Trusts; and it is further

ORDERED, ADJUDGED and DECREED that certificateholders, noteholders, and any other parties claiming rights or interests in any of the Undisputed Trusts are barred from asserting claims against any Petitioner with respect to any conduct taken to implement and comply with the terms of this Order and with respect to such Petitioner's administration and distribution of the Settlement Payments with respect to such Undisputed Trust, so long as such conduct is performed in accordance with the terms of this Order; and it is further

Matter of US Bank National Association 651625/2018
Consent Severance Order and Partial Final Judgment

ORDERED that the Clerk of New York County be, and hereby is, directed to enter this Order forthwith and without delay.

Dated: New York, New York
July 9, 2018

Hon. Marcy Friedman, J.S.C.

M.A.T.

Clerk of New York County

FILED

JUL 12 2018

COUNTY CLERK'S OFFICE
NEW YORK

10
9 of 22

**EXHIBIT A**

| Trust | Payment Admin. | Trustee |
|---|---|---|
| LMT 2005-1 | U.S. Bank | U.S. Bank |
| LMT 2006-2 | U.S. Bank | U.S. Bank |
| LMT 2006-8 | U.S. Bank | U.S. Bank |
| LMT 2007-3 | U.S. Bank | U.S. Bank |
| LMT 2007-6 | U.S. Bank | U.S. Bank |
| LMT 2007-7 | U.S. Bank | U.S. Bank |
| LMT 2007-8 | U.S. Bank | U.S. Bank |
| LXS 2006-11 | U.S. Bank | U.S. Bank |
| LXS 2006-12N | U.S. Bank | U.S. Bank |
| LXS 2006-19 | U.S. Bank | U.S. Bank |
| LXS 2006-3 | U.S. Bank | U.S. Bank |
| LXS 2006-8 | U.S. Bank | U.S. Bank |
| LXS 2006-15 | U.S. Bank | U.S. Bank |
| LXS 2006-20 | U.S. Bank | U.S. Bank |
| LXS 2007-16N | U.S. Bank | U.S. Bank |
| LXS 2007-20N | U.S. Bank | U.S. Bank |
| LXS 2007-5H | U.S. Bank | U.S. Bank |
| LXS 2007-7N | U.S. Bank | U.S. Bank |
| LXS 2007-8H | U.S. Bank | U.S. Bank |
| LXS 2007-12N | U.S. Bank | U.S. Bank |
| LXS 2007-9 | U.S. Bank | U.S. Bank |
| SARM 2005-6XS | U.S. Bank | U.S. Bank |
| SARM 2006-10 | U.S. Bank | U.S. Bank |
| SARM 2006-11 | U.S. Bank | U.S. Bank |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| SARM 2006-12 | U.S. Bank | U.S. Bank |
| SARM 2007-10 | U.S. Bank | U.S. Bank |
| SARM 2007-8 | U.S. Bank | U.S. Bank |
| SARM 2008-2 | U.S. Bank | U.S. Bank |
| SASCO 2003-25XS | U.S. Bank | U.S. Bank |
| SASCO 2004-11XS | U.S. Bank | U.S. Bank |
| SASCO 2004-13 | U.S. Bank | U.S. Bank |
| SASCO 2004-19XS | U.S. Bank | U.S. Bank |
| SASCO 2004-21XS | U.S. Bank | U.S. Bank |
| SASCO 2004-6XS | U.S. Bank | U.S. Bank |
| SASCO 2004-9XS | U.S. Bank | U.S. Bank |
| SASCO 2004-GEL2 | U.S. Bank | U.S. Bank |
| SASCO 2005-14 | U.S. Bank | U.S. Bank |
| SASCO 2005-3 | U.S. Bank | U.S. Bank |
| SASCO 2005-S4 | U.S. Bank | U.S. Bank |
| SASCO 2006-RF3 | U.S. Bank | U.S. Bank |
| SASCO 2006-RF4 | U.S. Bank | U.S. Bank |
| SASCO 2007-BC4 | U.S. Bank | U.S. Bank |
| SASCO 2007-TC1 | U.S. Bank | U.S. Bank |
| LXS 2007-4N | U.S. Bank | U.S. Bank |
| GPMF 2007-AR1 | U.S. Bank | U.S. Bank |
| GPMF 2007-AR2 | U.S. Bank | U.S. Bank |
| LXS 2006-2N | U.S. Bank | U.S. Bank |
| LXS 2007-2N | U.S. Bank | U.S. Bank |
| LXS 2005-7N | U.S. Bank | U.S. Bank |
| GPMF 2006-AR5 | U.S. Bank | U.S. Bank |

| **Trust** | **Payment Admin.** | **Trustee** |
|---|---|---|
| GPMF 2006-AR7 | U.S. Bank | U.S. Bank |
| GPMF 2006-AR4 | U.S. Bank | U.S. Bank |
| LXS 2006-4N | U.S. Bank | U.S. Bank |
| LXS 2006-GP4 | U.S. Bank | U.S. Bank |
| GPMF 2006-AR6 | U.S. Bank | U.S. Bank |
| LXS 2006-GP2 | U.S. Bank | U.S. Bank |
| LXS 2005-9N | U.S. Bank | U.S. Bank |
| LXS 2006-18N | U.S. Bank | U.S. Bank |
| LXS 2006-GP3 | U.S. Bank | U.S. Bank |
| LABMH 2001-B | U.S. Bank | U.S. Bank |
| FFML 2005-FF10 | U.S. Bank | U.S. Bank |
| LXS 2006-GP1 | U.S. Bank | U.S. Bank |
| GPMF 2006-AR8 | U.S. Bank | U.S. Bank |
| LXS 2006-14N | U.S. Bank | U.S. Bank |
| GPMF 2007-AR3 | U.S. Bank | U.S. Bank |
| SASCO 2005-4XS | U.S. Bank | Wilmington Trust |
| LABS 2007-1 | Wells Fargo | Wells Fargo |
| LMT 2006-9 | Wells Fargo | Wells Fargo |
| LMT 2007-5 | Wells Fargo | Wells Fargo |
| SAIL 2003-BC12 | Wells Fargo | Wells Fargo |
| SAIL 2003-BC3 | Wells Fargo | Wells Fargo |
| SARM 2004-10 | Wells Fargo | Wells Fargo |
| SARM 2004-16 | Wells Fargo | Wells Fargo |
| SARM 2004-18 | Wells Fargo | Wells Fargo |
| SARM 2004-9XS | Wells Fargo | Wells Fargo |
| SARM 2005-12 | Wells Fargo | Wells Fargo |

AB
12 of 22

| Trust | Payment Admin. | Trustee |
|---|---|---|
| SARM 2005-15 | Wells Fargo | Wells Fargo |
| SARM 2005-20 | Wells Fargo | Wells Fargo |
| SARM 2007-11 | Wells Fargo | Wells Fargo |
| SARM 2007-1 | Wells Fargo | Wells Fargo |
| SARM 2007-2 | Wells Fargo | Wells Fargo |
| SARM 2007-3 | Wells Fargo | Wells Fargo |
| SARM 2007-4 | Wells Fargo | Wells Fargo |
| SARM 2007-6 | Wells Fargo | Wells Fargo |
| SASCO 2003-15A | Wells Fargo | Wells Fargo |
| SASCO 2003-26A | Wells Fargo | Wells Fargo |
| SASCO 2003-34A | Wells Fargo | Wells Fargo |
| SASCO 2003-6A | Wells Fargo | Wells Fargo |
| SASCO 2005-S6 | Wells Fargo | Wells Fargo |
| SASCO 2005-S7 | Wells Fargo | Wells Fargo |
| SASCO 2007-BC1 | Wells Fargo | Wells Fargo |
| SASCO 2007-MN1 | Wells Fargo | Wells Fargo |
| SASCO 2007-OS1 | Wells Fargo | Wells Fargo |
| BNC 2006-2 | Wells Fargo | U.S. Bank |
| BNC 2007-1 | Wells Fargo | U.S. Bank |
| BNC 2007-2 | Wells Fargo | U.S. Bank |
| LMT 2007-10 | Wells Fargo | U.S. Bank |
| LMT 2008-6 | Wells Fargo | Wells Fargo |
| SAIL 2003-BC5 | Wells Fargo | U.S. Bank |
| SAIL 2003-BC11 | Wells Fargo | U.S. Bank |
| SAIL 2003-BC13 | Wells Fargo | U.S. Bank |
| SAIL 2004-3 | Wells Fargo | U.S. Bank |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| SAIL 2004-6 | Wells Fargo | U.S. Bank |
| SAIL 2004-10 | Wells Fargo | U.S. Bank |
| SAIL 2005-10 | Wells Fargo | U.S. Bank |
| SAIL 2006-1 | Wells Fargo | U.S. Bank |
| SAIL 2006-3 | Wells Fargo | U.S. Bank |
| SAIL 2006-4 | Wells Fargo | U.S. Bank |
| SARM 2005-22 | Wells Fargo | U.S. Bank |
| SARM 2005-23 | Wells Fargo | U.S. Bank |
| SARM 2006-1 | Wells Fargo | U.S. Bank |
| SARM 2006-2 | Wells Fargo | U.S. Bank |
| SARM 2006-4 | Wells Fargo | U.S. Bank |
| SARM 2006-5 | Wells Fargo | U.S. Bank |
| SARM 2006-6 | Wells Fargo | U.S. Bank |
| SARM 2006-7 | Wells Fargo | U.S. Bank |
| SARM 2006-9 | Wells Fargo | U.S. Bank |
| SASCO 2004-S2 | Wells Fargo | U.S. Bank |
| SASCO 2006-BC2 | Wells Fargo | U.S. Bank |
| SASCO 2006-BC3 | Wells Fargo | U.S. Bank |
| SASCO 2006-EQ1 | Wells Fargo | U.S. Bank |
| SASCO 2007-BC3 | Wells Fargo | U.S. Bank |
| BNCMT 2007-3 | Citibank | Wilmington Trust |
| LMT 2006-3 | Citibank | Wilmington Trust |
| LMT 2006-4 | Citibank | Wilmington Trust |
| LXS 2005-1 | Citibank | Wilmington Trust |
| LXS 2005-6 | Citibank | Wilmington Trust |
| LXS 2006-1 | Citibank | Wilmington Trust |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| LXS 2006-9 | Citibank | Wilmington Trust |
| LXS 2006-13 | Citibank | Wilmington Trust |
| LXS 2006-17 | Citibank | Wilmington Trust |
| LXS 2007-11 | Citibank | Wilmington Trust |
| SARM 2005-3XS | Citibank | Wilmington Trust |
| SASC 2003-18XS | Citibank | Wilmington Trust |
| SASC 2003-35 | Citibank | Wilmington Trust |
| SASC 2004-4XS | Citibank | Wilmington Trust |
| SASC 2004-16XS | Citibank | Wilmington Trust |
| SASC 2005-9XS | Citibank | Wilmington Trust |
| SASC 2005-15 | Citibank | Wilmington Trust |
| SASC 2005-17 | Citibank | Wilmington Trust |
| SASC 2006-ARS1 | Citibank | Wilmington Trust |
| SASC 2006-S3 | Citibank | Wilmington Trust |

**EXHIBIT B**

| Trust | Payment Admin. | Trustee |
|---|---|---|
| LMT 2005-1 | U.S. Bank | U.S. Bank |
| LMT 2006-2 | U.S. Bank | U.S. Bank |
| LMT 2006-8 | U.S. Bank | U.S. Bank |
| LMT 2007-3 | U.S. Bank | U.S. Bank |
| LMT 2007-6 | U.S. Bank | U.S. Bank |
| LMT 2007-7 | U.S. Bank | U.S. Bank |
| LMT 2007-8 | U.S. Bank | U.S. Bank |
| LXS 2006-11 | U.S. Bank | U.S. Bank |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| LXS 2006-12N | U.S. Bank | U.S. Bank |
| LXS 2006-15 | U.S. Bank | U.S. Bank |
| LXS 2006-20 | U.S. Bank | U.S. Bank |
| LXS 2006-19 | U.S. Bank | U.S. Bank |
| LXS 2006-8 | U.S. Bank | U.S. Bank |
| LXS 2007-16N | U.S. Bank | U.S. Bank |
| LXS 2007-20N | U.S. Bank | U.S. Bank |
| LXS 2007-5H | U.S. Bank | U.S. Bank |
| LXS 2007-7N | U.S. Bank | U.S. Bank |
| LXS 2007-12N | U.S. Bank | U.S. Bank |
| LXS 2007-9 | U.S. Bank | U.S. Bank |
| SARM 2005-6XS | U.S. Bank | U.S. Bank |
| SARM 2006-10 | U.S. Bank | U.S. Bank |
| SARM 2006-11 | U.S. Bank | U.S. Bank |
| SARM 2006-12 | U.S. Bank | U.S. Bank |
| SARM 2007-10 | U.S. Bank | U.S. Bank |
| SARM 2007-8 | U.S. Bank | U.S. Bank |
| SARM 2008-2 | U.S. Bank | U.S. Bank |
| SASCO 2003-25XS | U.S. Bank | U.S. Bank |
| SASCO 2004-11XS | U.S. Bank | U.S. Bank |
| SASCO 2004-13 | U.S. Bank | U.S. Bank |
| SASCO 2004-19XS | U.S. Bank | U.S. Bank |
| SASCO 2004-21XS | U.S. Bank | U.S. Bank |
| SASCO 2004-6XS | U.S. Bank | U.S. Bank |
| SASCO 2004-9XS | U.S. Bank | U.S. Bank |
| SASCO 2004-GEL2 | U.S. Bank | U.S. Bank |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| SASCO 2005-14 | U.S. Bank | U.S. Bank |
| SASCO 2005-3 | U.S. Bank | U.S. Bank |
| SASCO 2006-RF3 | U.S. Bank | U.S. Bank |
| SASCO 2006-RF4 | U.S. Bank | U.S. Bank |
| SASCO 2007-BC4 | U.S. Bank | U.S. Bank |
| SASCO 2007-TC1 | U.S. Bank | U.S. Bank |
| LXS 2007-4N | U.S. Bank | U.S. Bank |
| GPMF 2007-AR1 | U.S. Bank | U.S. Bank |
| GPMF 2007-AR2 | U.S. Bank | U.S. Bank |
| LXS 2006-2N | U.S. Bank | U.S. Bank |
| LXS 2007-2N | U.S. Bank | U.S. Bank |
| LXS 2005-7N | U.S. Bank | U.S. Bank |
| GPMF 2006-AR5 | U.S. Bank | U.S. Bank |
| GPMF 2006-AR7 | U.S. Bank | U.S. Bank |
| GPMF 2006-AR4 | U.S. Bank | U.S. Bank |
| LXS 2006-4N | U.S. Bank | U.S. Bank |
| LXS 2006-GP4 | U.S. Bank | U.S. Bank |
| GPMF 2006-AR6 | U.S. Bank | U.S. Bank |
| LXS 2006-GP2 | U.S. Bank | U.S. Bank |
| LXS 2005-9N | U.S. Bank | U.S. Bank |
| LXS 2006-18N | U.S. Bank | U.S. Bank |
| LXS 2006-GP3 | U.S. Bank | U.S. Bank |
| LABMH 2001-B | U.S. Bank | U.S. Bank |
| FFML 2005-FF10 | U.S. Bank | U.S. Bank |
| LXS 2006-GP1 | U.S. Bank | U.S. Bank |
| GPMF 2006-AR8 | U.S. Bank | U.S. Bank |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| LXS 2006-14N | U.S. Bank | U.S. Bank |
| GPMF 2007-AR3 | U.S. Bank | U.S. Bank |
| SASCO 2005-4XS | U.S. Bank | Wilmington Trust |
| LABS 2007-1 | Wells Fargo | Wells Fargo |
| LMT 2006-9 | Wells Fargo | Wells Fargo |
| LMT 2007-5 | Wells Fargo | Wells Fargo |
| SAIL 2003-BC12 | Wells Fargo | Wells Fargo |
| SAIL 2003-BC3 | Wells Fargo | Wells Fargo |
| SARM 2004-10 | Wells Fargo | Wells Fargo |
| SARM 2004-16 | Wells Fargo | Wells Fargo |
| SARM 2004-18 | Wells Fargo | Wells Fargo |
| SARM 2004-9XS | Wells Fargo | Wells Fargo |
| SARM 2005-12 | Wells Fargo | Wells Fargo |
| SARM 2005-15 | Wells Fargo | Wells Fargo |
| SARM 2005-20 | Wells Fargo | Wells Fargo |
| SARM 2007-11 | Wells Fargo | Wells Fargo |
| SARM 2007-1 | Wells Fargo | Wells Fargo |
| SARM 2007-2 | Wells Fargo | Wells Fargo |
| SARM 2007-3 | Wells Fargo | Wells Fargo |
| SARM 2007-4 | Wells Fargo | Wells Fargo |
| SARM 2007-6 | Wells Fargo | Wells Fargo |
| SASCO 2003-15A | Wells Fargo | Wells Fargo |
| SASCO 2003-26A | Wells Fargo | Wells Fargo |
| SASCO 2003-34A | Wells Fargo | Wells Fargo |
| SASCO 2003-6A | Wells Fargo | Wells Fargo |
| SASCO 2007-BC1 | Wells Fargo | Wells Fargo |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| SASCO 2007-MN1 | Wells Fargo | Wells Fargo |
| SASCO 2007-OS1 | Wells Fargo | Wells Fargo |
| BNC 2007-1 | Wells Fargo | U.S. Bank |
| BNC 2007-2 | Wells Fargo | U.S. Bank |
| LMT 2007-10 | Wells Fargo | U.S. Bank |
| LMT 2008-6 | Wells Fargo | Wells Fargo |
| SAIL 2003-BC5 | Wells Fargo | U.S. Bank |
| SAIL 2003-BC11 | Wells Fargo | U.S. Bank |
| SAIL 2003-BC13 | Wells Fargo | U.S. Bank |
| SAIL 2004-3 | Wells Fargo | U.S. Bank |
| SAIL 2004-6 | Wells Fargo | U.S. Bank |
| SAIL 2004-10 | Wells Fargo | U.S. Bank |
| SAIL 2005-10 | Wells Fargo | U.S. Bank |
| SAIL 2006-1 | Wells Fargo | U.S. Bank |
| SAIL 2006-3 | Wells Fargo | U.S. Bank |
| SAIL 2006-4 | Wells Fargo | U.S. Bank |
| SARM 2005-22 | Wells Fargo | U.S. Bank |
| SARM 2005-23 | Wells Fargo | U.S. Bank |
| SARM 2006-1 | Wells Fargo | U.S. Bank |
| SARM 2006-2 | Wells Fargo | U.S. Bank |
| SARM 2006-4 | Wells Fargo | U.S. Bank |
| SARM 2006-5 | Wells Fargo | U.S. Bank |
| SARM 2006-6 | Wells Fargo | U.S. Bank |
| SARM 2006-7 | Wells Fargo | U.S. Bank |
| SARM 2006-9 | Wells Fargo | U.S. Bank |
| SASCO 2004-S2 | Wells Fargo | U.S. Bank |

| Trust | Payment Admin. | Trustee |
|---|---|---|
| SASCO 2006-BC2 | Wells Fargo | U.S. Bank |
| SASCO 2006-BC3 | Wells Fargo | U.S. Bank |
| SASCO 2006-EQ1 | Wells Fargo | U.S. Bank |
| SASCO 2007-BC3 | Wells Fargo | U.S. Bank |
| BNCMT 2007-3 | Citibank | Wilmington Trust |
| LMT 2006-3 | Citibank | Wilmington Trust |
| LMT 2006-4 | Citibank | Wilmington Trust |
| LXS 2005-1 | Citibank | Wilmington Trust |
| LXS 2005-6 | Citibank | Wilmington Trust |
| LXS 2006-1 | Citibank | Wilmington Trust |
| LXS 2006-9 | Citibank | Wilmington Trust |
| LXS 2006-13 | Citibank | Wilmington Trust |
| LXS 2006-17 | Citibank | Wilmington Trust |
| LXS 2007-11 | Citibank | Wilmington Trust |
| SARM 2005-3XS | Citibank | Wilmington Trust |
| SASC 2003-18XS | Citibank | Wilmington Trust |
| SASC 2003-35 | Citibank | Wilmington Trust |
| SASC 2004-4XS | Citibank | Wilmington Trust |
| SASC 2004-16XS | Citibank | Wilmington Trust |
| SASC 2005-9XS | Citibank | Wilmington Trust |
| SASC 2005-15 | Citibank | Wilmington Trust |
| SASC 2005-17 | Citibank | Wilmington Trust |
| SASC 2006-ARS1 | Citibank | Wilmington Trust |

**EXHIBIT C**

| Trust | Payment Admin. | Trustee |
|---|---|---|
| SASCO 2005-S4 | U.S. Bank | U.S. Bank |

21 of 22

**EXHIBIT D**

| Trust | Payment Admin. | Trustee |
|---|---|---|
| LXS 2006-3 | U.S. Bank | U.S. Bank |
| BNC 2006-2 | Wells Fargo | U.S. Bank |
| SASCO 2005-S6 | Wells Fargo | Wells Fargo |
| SASCO 2005-S7 | Wells Fargo | Wells Fargo |
| SASC 2006-S3 | Citibank | Wilmington Trust |

651625/18

HAHN & HESSEN LLP

Zachary G. Newman
Stephen J. Grable
Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
(212) 478-7200

FAEGRE BAKER DANIELS LLP

Robert L. Schnell*
Stephen M. Mertz*
Michael F. Doty*
Ryan G. Milligan*
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-6000

*Attorneys for Petitioner Wells Fargo Bank, National Association*

* pro hac vice forthcoming

MAYER BROWN LLP

Christopher J. Houpt
Jarman D. Russell
1221 Avenue of the Americas
New York, New York 10020-1001
Tel. (212) 506-2500

*Attorneys for Petitioner Citibank, N.A.*

ALSTON & BIRD LLP

Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel.: 212-910-9400

*Attorneys for Petitioners Wilmington Trust, National Association and Wilmington Trust Company*

MORGAN, LEWIS & BOCKIUS LLP

Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York 10178
Tel.: 212-309-6000

Kurt W. Rademacher
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel.: 215-963-5000

*Attorneys for Petitioner U.S. Bank National Association*

Judgment

FILED
JUL 12 2018
AT 2:31 PM
N.Y., CO. CLK'S OFFICE

# Exhibit 3

No. 1598461

## Certification

STATE OF NEW YORK, COUNTY OF NEW YORK, SS:

I, Milton Adair Tingling, County Clerk and Clerk of Supreme Court New York County, do hereby certify that on September 23, 2024 I have compared the document attached hereto,

STIPULATION - SO ORDERED page(s) 3

with the originals filed in my office and the same is a correct transcript therefrom and of the whole of such original in witness whereto I have affixed my signature and seal.

Milton Adair Tingling

MILTON ADAIR TINGLING
NEW YORK COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| In the matter of the application of<br><br>U.S. BANK NATIONAL ASSOCIATION, WELLS FARGO BANK, NATIONAL ASSOCIATION, WILMINGTON TRUST, NATIONAL ASSOCIATION, WILMINGTON TRUST COMPANY, and CITIBANK, N.A. (as Trustees, Indenture Trustees, Securities Administrators, Paying Agents, and/or Calculation Agents of Certain Residential Mortgage-Backed Securitization Trusts),<br><br>Petitioners,<br><br>For Judicial Instructions under CPLR Article 77 on the Administration and Distribution of a Settlement Payment. | : | Index No. 651625/2018<br>Hon. Melissa A. Crane<br><br>**STIPULATION AND ~~[PROPOSED]~~ ORDER** |

------------------------------------------------------------ x

WHEREAS, Petitioners commenced this action with the filing of the Petition (NYSCEF Doc. No. 1) seeking judicial guidance regarding the distribution and administration of certain settlement payments among the settlement trusts subject to the Petition and listed on Exhibit A thereto (NYSCEF Doc. No. 2), as amended (NYSCEF Doc. No. 84) (the "Subject Settlement Trusts");

WHEREAS, by Interim Decision and Order dated March 19, 2020 (NYSCEF Doc. No. 239) (the "Referral Order"), the Court ruled its resolution of certain disputed issues required interpretation of agreements over which the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") had retained jurisdiction, and ordered Petitioners to "advise the Bankruptcy Court of this decision and order" and further ordered the proceeding "stayed pending hearing and determination by the Bankruptcy Court of the aforesaid issues";

WHEREAS, in a series of partial severance orders and partial final judgments entered between December 17, 2018 (NYSCEF Doc. No. 196) and June 5, 2024 (NYSCEF Doc. No. 318) (the "Severance Judgments"), the Court has instructed the Petitioners with respect to the relief requested in the Petition for each of the Subject Settlement Trusts, and with the severance of these trusts from the case, no further judicial guidance is being requested by Petitioners in this proceeding;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, subject to the approval of the Court, as follows:

1. With respect to the Subject Settlement Trusts, the Referral Order has been mooted by the resolution of the issues set forth in the Petition and this proceeding no longer presents issues requiring interpretation of the Settlement Agreement or other guidance from the Bankruptcy Court.
2. The Court retains jurisdiction to enforce the terms of its Severance Judgments.
3. Except as otherwise set forth herein, all matters presented in the Petition have been resolved and this proceeding is closed.
4. This stipulation may be executed in counterparts.

**SO ORDERED:**

_______________________________ Dated: 7/3/24
HON. MELISSA A. CRANE, J.S.C.

Dated: New York, New York
July 2, 2024

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Kurt W. Rademacher*
Michael S. Kraut
Kurt W. Rademacher

101 Park Avenue
New York, New York 10178
(212) 309-6000

*Attorneys for U.S. Bank National Association*

ALSTON & BIRD LLP

By: */s/ Alexander S. Lorenzo*
Alexander S. Lorenzo

90 Park Avenue
New York, New York 10016
(212) 910-9400

*Attorneys for Wilmington Trust Company and Wilmington Trust, National Association*

MAYER BROWN LLP

By: */s/ Jarman D. Russell*
Christopher J. Houpt
Jarman D. Russell

1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Citibank, N.A.*

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Clay J. Pierce*
Clay J. Pierce

1177 Avenue of the Americas, 41st Floor
New York, New York 10036
(212) 248-3140

*Attorneys for Wells Fargo Bank, National Association*

~~SO ORDERED, July ___, 2024~~

______________________________
~~J.S.C.~~